(No. 95740.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. EDWARD A. MILKA, Appellant.

*Opinion filed March 18, 2004.—Rehearing denied May 24, 2004.*

G. Joseph Weller, Deputy Defender, and Thomas A. Lilien, Assistant Defender, of the Office of the State Appellate Defender, of Elgin, and Stephen M. Komie, of Chicago, for appellant.

Lisa M. Madigan, Attorney General, of Springfield, and Gary W. Pack, State's Attorney, of Woodstock (Norbert J. Goetten, Martin P. Moltz and Cynthia N. Schneider, of the Office of the State's Attorneys Appellate Prosecutor, of Elgin, of counsel), for the People.

CHIEF JUSTICE McMORROW delivered the opinion of the court:

A grand jury indicted the defendant, Edward Milka, on five counts, including one count of predatory criminal sexual assault of a child and one count of felony murder predicated on predatory criminal sexual assault of a child. During defendant's jury trial, after the State had presented its case in chief, the prosecutor nol-prossed the charge of predatory criminal sexual assault of a child. The trial continued, and defendant was convicted of felony murder predicated on predatory criminal sexual assault of a child. Defendant received an extended-term sentence of 75 years.

On appeal, defendant maintained that the State's dismissal of the charge of predatory criminal sexual assault of a child had the effect of an acquittal, such that his conviction for felony murder based on that felony violated the bar against double jeopardy. Defendant also contended that the evidence was insufficient to support his conviction, and that his extended-term sentence was invalid because it was based on an improper double enhancement. The appellate court rejected defendant's double jeopardy argument and his challenge to the sufficiency of the evidence. However, the court agreed that his extended-term sentence was invalid. The appellate court affirmed defendant's conviction, vacated his sentence and remanded the cause for resentencing. 336 Ill. App. 3d 206.

Defendant thereafter filed a petition for leave to appeal in this court (see 177 Ill. 2d R. 315(a)) in which he alleged that the appellate court erred both in holding that no double jeopardy violation occurred and in holding that the evidence was sufficient to support his conviction. We allowed defendant's petition. Our grant of defendant's petition brings before us the State's request for cross-relief (see 155 Ill. 2d R. 318(a); 134 Ill. 2d R.

612(b)), in which the State contests the appellate court's holding that defendant's extended-term sentence was based on an improper double enhancement. For the reasons that follow, we hold that the bar against double jeopardy was not violated in this case, that the evidence was sufficient to support defendant's conviction, and that defendant's extended-term sentence was based on an improper double enhancement.

## BACKGROUND

On the evening of May 17, 1997, a group of friends canoeing on the Kishwaukee River near Union, Illinois, discovered the lifeless body of a young girl lying on a sandbar. The body, which was naked from the waist up and partially decomposed, was later identified as Brittany Martinez, an 11-year-old girl who had been missing from her home in Elgin, Illinois, since the evening of May 8, 1997.

The police investigation of Brittany's death led to the arrest of her uncle, the defendant, Edward Milka. On December 18, 1997, a grand jury in McHenry County returned a five-count indictment against defendant. Count I of the indictment alleged that defendant committed first degree murder (720 ILCS 5/9—1(a)(2) (West 1996)) in that he asphyxiated Brittany Martinez knowing that such act created a strong probability of death or great bodily harm; count II alleged that defendant committed first degree murder (720 ILCS 5/9—1(a)(3) (West 1996)) in that he asphyxiated Brittany Martinez while committing the forcible felony of aggravated kidnapping; count III alleged that defendant committed first degree murder (720 ILCS 5/9—1(a)(3) (West 1996)) in that he asphyxiated Brittany Martinez while committing the forcible felony of predatory criminal sexual assault of a child; count IV alleged that defendant committed predatory criminal sexual assault of a child (720 ILCS 5/12—14.1(a)(1) (West 1996)); and count V alleged that defen-

dant committed aggravated kidnapping (720 ILCS 5/10—1(a)(1) (West 1996); 720 ILCS 10—2(a)(2) (West 1996)). A trial was held before a jury in the circuit court of McHenry County from April 24, 2000, to May 15, 2000. Testimony at trial established the following facts.

The sandbar on which Brittany's body was found was located about a mile downstream from the Hemmingson Road bridge, just outside the town of Union, Illinois, in McHenry County. Union is a small community, surrounded primarily by farmland. Several white farmhouses were in the area where Brittany's body was discovered, including two such farmhouses near the Hemmingson Road bridge. Witnesses estimated that the drive between Union and Elgin took approximately 30 to 40 minutes.

At the point where Brittany's body was found, the Kishwaukee River ran through a grassy area and was the size of a large creek. There were no roads or pathways leading to the river. Police officers searched the sandbar where Brittany's body was discovered, as well as the surrounding riverbanks. The officers found no footprints, drag marks or other evidence. A search of the river downstream also uncovered nothing of evidentiary value.

The lead police officer investigating Brittany's death considered the Hemmingson Road bridge to be the most likely spot for the body to have been placed in the river, due to the relatively straight and deep stretch of water running downstream from that point. No shoe prints, tire prints, or other evidence was found at the Hemmingson Road bridge, which was paved. Other bridges upstream from where the body was recovered were also searched, but no evidence was discovered.

An autopsy was conducted on Brittany's body on May 18, 1997. The pathologist who performed the autopsy, Dr. Larry Blum, testified that the clothing found on the body consisted of a pair of blue jeans with the fly opened about 1 1/2 inches, magenta underpants which were turned

inside out, yellow socks, and tennis shoes which were still tied. Also found on the body was a piece of 3/4-inch masking tape, 10 to 12 inches long, running from the right ear, under the chin, and up toward the left ear. Blum stated that, when he examined the body, the process of decomposition was well established. There were fly eggs and maggots around the face and in the hair. There was no rigor mortis. Given the state of decomposition and the lack of rigor mortis, Blum concluded that death had occurred at least a few days before the body was discovered.

Blum described the injuries found on Brittany's body. There were contusions on the left cheek, the right knee, and the back of the right thigh. In addition, there was evidence of blunt force trauma to the internal genitalia. There were two lacerations in the hymenal ring, both of which were fresh and showed no signs of healing. There was a large amount of red blood in the vagina, which resulted from the tear of the tissue, not decomposition. At the bottom of the vaginal ring, there was a contused area which was caused by blunt trauma. The hemorrhaging there was fresh and the blood vessels under the skin were broken. Also, the inner area of the vaginal region had pinpoint hemorrhages called petechiae, which can result from blunt trauma. According to Blum, the lacerations to the vagina were inflicted shortly before death. Further, for the hymen to have been injured, an object had to have been introduced to stretch and tear the tissue. In Blum's opinion, the blunt force trauma to the vaginal area was evidence of sexual assault.

Blum further testified that Brittany's stomach contained recently eaten, but little digested, food, while the first part of the small intestine was empty. The food in the stomach included some meat material such as chicken, a fruit material, including pears and peaches, and some vegetable material, most likely french fried

potatoes. Blum opined that Brittany had eaten within the last two or three hours before her death.

Blum concluded that Brittany died of asphyxia, such as by strangulation, suffocation or drowning. Based on the physical evidence available, Blum doubted that Brittany drowned, but he could not conclusively rule out drowning as a cause of death. Blum could not determine whether Brittany was alive or dead when she entered the river. In Blum's view, Brittany's death was not accidental, since her body was found in a secluded area far from home, with signs of sexual assault.

Steve Dunton, a forensic pathologist who testified on behalf of defendant, agreed with Blum that the hymenal lacerations found on Brittany's body were likely caused by the insertion of an object into the vagina. Dunton also agreed that Brittany had eaten approximately two hours before her death. Dunton was not certain, however, that Brittany was the victim of a homicide and would have classified the manner of her death as undetermined. Further, while Dunton agreed with Blum that the cause of Brittany's death was asphyxiation, he believed, based on the available physical evidence, that the type of asphyxiation could be identified as drowning.

Forensic entomologists testified as expert witnesses on behalf of both the State and defendant. Based on an examination of maggot larvae and eggs collected during the autopsy, the State's expert concluded that the colonization of maggots found on the body occurred on May 9, 1997, during the hottest part of the day, or between 12 and 4 p.m. Death preceded the colonization. Defendant's expert concluded that the colonization could have occurred as late as May 12, 1997.

Wendi Howlett, Brittany's mother and defendant's sister, testified about the events that took place on May 8, 1997, the day Brittany was reported missing. Wendi stated that, on that day, she and Brittany went on a field

trip with Brittany's school class to the Shedd Aquarium in Chicago. Brittany was wearing a "scrunchie" to hold her hair, and was carrying a pink key chain that could be put on her wrist or belt buckle. At the aquarium, Brittany ate lunch between noon and 1 p.m. The lunch consisted of a sandwich, chips, juice and a small can of fruit cocktail. The class returned to Elgin by 2:30 p.m. and was dismissed from school.

Wendi stated that, after school, she drove to her parents' house to pick up her son, and then went home. Brittany changed her shirt, putting on a blue, park district T-shirt with numbers on the back. Between 4 and 4:30 p.m., Wendi took the children to a McDonald's restaurant. Brittany ate chicken nuggets and french fries, and had a Coke in a child-size cup. Wendi had a medium-size drink. Wendi stated that, as far as she knew, Brittany had not eaten any fruit on May 8, aside from the can of fruit cocktail she had at lunch. However, an Elgin police officer testified that, on May 20, 1997, Wendi told him that Brittany had eaten a cup or bowl of whole peaches between 2 and 3 p.m. on May 8.

Wendi stated that, after going to McDonald's, she and the children went to a park. The family then returned home, arriving a little after 5 p.m. After they got home, Brittany walked with some friends to Wing Park, which was near her family's apartment. At approximately 5:30 p.m., Wendi and her son left the apartment to visit her sister-in-law, Pam Howlett, who lived down the street. Wendi stated that she left a note for Brittany on the apartment door, telling her where she was, and instructing Brittany to come to Pam's house when she got back. Wendi also told a neighbor, Brian Smith, that if he should see Brittany, he should tell her that Wendi had gone to Pam's.

One of Brittany's friends testified that Brittany returned to the apartment building at approximately 6

p.m. Smith stated that, at about that time, he helped Brittany carry her bicycle up from the basement storage area in which it was kept. Smith also stated that he gave Wendi's message to Brittany and then saw Brittany ride off in the direction of Pam's house.

Wendi testified that she returned home from her sister-in-law's at about 6:10 p.m. Brittany was not home, and Wendi assumed that she was still at the park. Wendi started getting ready for work. Wendi explained that she worked at night, cleaning businesses in the area. Defendant worked with her. Wendi stated that, on occasion, Brittany would go with Wendi and defendant on their cleaning jobs to earn money for a new bicycle. On the night of May 8, 1997, Wendi was supposed to meet with defendant at one of their jobsites, a business called W.J. Dennis. Wendi stated that she did not plan on bringing Brittany to work on May 8.

Wendi testified that her husband, Scott Howlett, arrived home at approximately 6:30 p.m. Scott told Wendi that he had seen Brittany's friends outside, but that he had not seen Brittany. Wendi spoke to Brittany's friends, who told her that they had seen Brittany riding her bike toward Wendi's sister-in-law's house. Wendi checked there, and elsewhere, but was unable to find Brittany. Concerned, Wendi returned home and called the police. The police arrived at approximately 7:10 p.m. and, along with friends and family, began searching the area for Brittany. At approximately 8 p.m., police officers learned that Brittany had taken her bike from the basement of the apartment building. The officers looked in the basement and found the bike in its normal location, in an unlocked storage area.

Several family members, including Wendi and Scott Howlett, defendant's mother, Florence Milka, and defendant's sisters, Dawn and Tracey Milka, testified that they saw defendant arrive outside Wendi's apart-

ment building shortly after 8 p.m., while the search for Brittany was ongoing. Wendi and Dawn's testimony was impeached, however, with prior statements in which they placed defendant at the apartment nearer to 9 p.m. The witnesses who testified as to defendant's arrival stated that he drove to the apartment building in a blue Lincoln Towncar which belonged to his mother and which he often drove. The witnesses noted that there were cleaning supplies and a garbage can in the backseat of the car. Wendi stated that when defendant arrived at the apartment, he got out of the car, approached her, and asked her what had happened. Wendi, who was speaking to a police officer, told him that Brittany was missing and then directed him to his mother and his sister, Tracey, who were standing nearby. Wendi did not notice anything unusual about defendant's appearance. Tracey testified that, while talking with her, defendant stated that he had come to pick up Wendi for their cleaning job at approximately 6 p.m. and that he had seen Brittany then.

In statements given to the police, defendant said that he joined in the search for Brittany for a time, and then went to a neighbor's house to meet a group of friends who were watching a basketball game. The four friends who were at the house that night testified at trial. They stated that defendant arrived between 10:30 and 11 p.m., and that he was visibly upset. When asked what was wrong, defendant told the friends that his niece was missing. One of the friends, Regina Cervantes, testified that defendant told her that Brittany had been playing in the park and that he had gone to pick her up. Defendant further stated that he had told Brittany to wait by the car and that, when he returned, she was gone. Cervantes stated that defendant was crying as he told her this. Defendant did not ask any of the friends at the neighbor's home for help in looking for Brittany.

Defendant left the neighbor's home at approximately 12:45 a.m. Upon leaving, he met police officers who had been looking for him at his house. The officers who met defendant testified that they explained to defendant that they were sent to find him because it had been reported that he was the last person to have seen Brittany. The officers told defendant that they wanted his account of what had happened when he saw her. Defendant indicated that he did not mind talking to the officers and accompanied them to a police car.

As they were walking, one of the officers asked where defendant had last seen Brittany. He said that she was leaning against Wendi's car on Royal Boulevard. Defendant stated that he had gone to pick up Wendi to go to work, but since she was not home, he stopped to see Brittany, who was roller-blading. When asked again where he had last seen Brittany, defendant replied that she was sitting on the hood of a car. In the police car, defendant was again asked about the last time he saw Brittany. This time, defendant stated that she was on the front stoop by the mailbox, and not by the car. Defendant was asked whether Brittany had been in his car on the night of May 8. Defendant replied, "absolutely not." Defendant consented to a search of the Lincoln Towncar which he had been driving, and agreed to go to the police station to be interviewed.

At the station, defendant gave a description of what Brittany was wearing the last time he saw her. He stated that she was wearing a light blue, basketball-type jersey with a white number on the back, faded blue jeans, and old, dirty, white high-top athletic shoes. He also stated that she had a clasp to pull her hair out of her face, and that she had a pink key chain.

After describing earlier activities that took place on May 8, 1997, defendant told the police that he left home at 5:45 p.m., intending to go to work at W.J. Dennis, one

of the office buildings that he and Wendi cleaned. However, instead of heading to W.J. Dennis, he decided to drive by Wendi's home. He arrived in front of Wendi's apartment building between 6 and 6:15 p.m. in the Lincoln. He saw Brittany and stopped. Brittany approached the car and defendant asked her where her mother was. Brittany replied that Wendi was at the park, looking for her. Defendant said that Wendi was to meet him at W.J. Dennis when she got back.

Defendant stated that Brittany then entered the Lincoln. He and Brittany talked for awhile, then Brittany gave him a kiss and a hug and exited the car. Defendant said that he then waited 10 to 15 minutes, as Brittany rode her bicycle up and down the sidewalk. He also stated that he may have seen Brittany take the bicycle back into the apartment building.

Defendant told the police that he then left for W.J. Dennis. On the way, at 6:30 or 6:45 p.m., he stopped at a Speedway gas station to buy cigarettes. He arrived at W.J. Dennis at about 7 p.m. Defendant saw a vehicle in the parking lot, and decided not to enter since someone was still inside. He returned a short time later, parked the car and entered the building. Defendant stated that he set up his cleaning supplies, but then sat in the break room, smoking and drinking a soda. He waited for about an hour for Wendi to arrive. At approximately 8:30 p.m., defendant packed up his supplies and left, without having done any cleaning. While he was driving to a second cleaning job, something hit his windshield, and he stopped at the same Speedway station to clean it off. He then drove to the second jobsite, saw that Wendi's car was not there, and continued on to her apartment, arriving at about 9 p.m. He was told that Brittany was missing, and he drove through Wing Park looking for her. He also drove through another park with his sister, Dawn. He then dropped Dawn off and returned to his own neighborhood where he met up with friends.

An executive from W.J. Dennis testified that he stayed at the office until about 8:10 p.m. on May 8, 1997. He had a clear view of the parking lot, but saw only his own car, a blue-green Lincoln. No other cars were in the front parking lot after 4:30 p.m. He did not see defendant, and his office was not cleaned that night. The surveillance tape for the evening of May 8, 1997, was obtained from the Speedway station. Defendant does not appear at anytime on the tape.

Defendant met with another police officer in the afternoon of May 9, 1997, and was asked to retrace his steps from May 8. Defendant entered the officer's car and recounted his activities as the officer drove. The account that defendant gave the officer was substantially similar to the one defendant gave during his interview at the police station.

On May 10, 1997, defendant gave another statement to the police, saying that he had lied before and now wanted to tell the truth. After recounting his activities earlier in the day on May 8, 1997, defendant said that he first arrived at Wendi's home at about 6 p.m. He saw Brittany riding her bicycle up and down the street. She took the bike into the apartment building, and then came out and sat on her mother's car. Defendant motioned Brittany to his car, and she came in and sat on the front seat. Brittany told defendant where Wendi was and he left at 6:15 or 6:20, giving Brittany a kiss on the cheek and a hug.

Defendant then stated that he drove directly to W.J. Dennis, where he saw a white Cadillac in the parking lot. Defendant did not enter the building because he was under the influence of marijuana and did not want to be seen. Defendant stated that he drove around, and finally parked in a lot east of the building, where he waited for the Cadillac to leave. One of the police officers told defendant that a surveillance video may have shown that

his car was not in that parking lot, and defendant replied that he did not park there. Defendant said that he entered the building about 8:15 p.m., when the car left. He stayed inside the building for 50 to 60 minutes but did not clean.

Defendant stated that, after he left, his windshield was hit by mud and he went to the Speedway station to clean it off. When the officers asked him about his prior statements that he stopped at the Speedway to buy cigarettes, defendant said that he had gone to the Speedway twice, but that he did not go inside on the first occasion. Defendant did not explain why he stopped at the Speedway the first time. Defendant stated that he arrived at Wendi's apartment at approximately 9:10 p.m.

After giving the above statement, a detective asked defendant to imagine where Brittany might be and told him that her whereabouts might come to him if he thought about it. According to the detective, defendant then put his hands to his temples, rubbed them, and said that he felt that the victim was close. First he said that she was near Elgin, then he said that she was in Elgin. The detective asked if defendant knew where she was, but defendant said that he did not. When asked how the victim felt, where she was, and what she was doing, defendant kept rubbing his temples, closed his eyes, tilted his head back, started to sob, and said that she was cold, very cold, and that she was wet. When asked whether Brittany was alive, defendant said that he did not know, but said that she was not breathing. He also said that she was not bleeding. Defendant asked for a cigarette, and was taken outside to smoke. While smoking, defendant began to pace, moving his hands a lot and mumbling. Defendant said that he could see two male Hispanics, driving a gray, two-door Oldsmobile and drinking beer. The males were touching Brittany all over, but they were not trying to have sex with her. Defendant asked to call

Wendi to tell her that Brittany was dead, and he hugged the detective for about a minute.

Inside, the detective phoned Wendi in defendant's presence and said that he had something to tell her and that she needed to come to the station. He sat with defendant after the phone call. Defendant continued to sob and rubbed his temples and head with his eyes closed. Defendant said that he saw a white farmhouse, farmland, a bridge, rocks, water, a creek, a dirt road and a gravel road. He said again that he saw male Hispanics touching the victim all over. When asked whether the victim had drowned, defendant said that she had not, but that she was not breathing. The detective asked whether the victim had been sexually assaulted. Defendant opened his eyes, looked at the detective, raised his voice and said no, she was not.

The detective stated that, when Wendi arrived, she went into a room with defendant and was alone with him for about two minutes. She then asked her cousin, who was with her, to join them. A few minutes later, the detective went into the room, where defendant said that he had been having visions that Brittany was dead but that she was not really dead.

At trial, the defense introduced testimony in an attempt to establish that defendant was of low intelligence and was impressionable, and that his statement describing Brittany's whereabouts to the police was simply a recounting of a message received from a psychic who had visited the family. Florence Milka, defendant's mother, testified that defendant had lived with her his whole life, that he was a slow learner who had been placed in special education, and that he had extreme difficulty with reading and writing. Florence further stated that she told members of her family, including defendant, that a psychic had envisioned that Brittany was cold, wet, and near a bridge in a wooded area. The conversation with

the family occurred before defendant went to the police station on May 10. Florence did not remember the psychic mentioning a farmhouse, farmland or a creek. Dawn Milka, defendant's sister, also testified that defendant was a slow learner. She further stated that the psychic to whom Florence referred had mentioned a white farmhouse.

A special agent for the FBI testified that on May 10, 1997, he searched the blue Lincoln Towncar which defendant had driven on May 8, 1997. The agent recovered some fabric samples from the car's seats and carpets. He also recovered a McDonald's cup and lid, which were under some plastic bags on the floor behind the passenger's seat. The interior of the car was generally unkempt. The trunk contained a vacuum cleaner and some garbage bags.

A physical scientist for the FBI testified that fibers on Brittany's jeans were consistent with those in the carpets of the Lincoln. The scientist could not determine, however, when the fibers got onto the jeans.

Melissa Anne Smrz, a supervisory forensic serologist for the FBI, testified that human blood was detected on the floor mat from the right rear passenger seat of the Lincoln. Human blood was also detected at two spots on the standard-type McDonald's cup found in the car. The blood appeared where a person might put a hand to hold the cup, and on the lid of the cup, in a smear or little series of spatters. Smrz conducted the PCR form of DNA analysis on the stains from the cup, lid and one floor mat, testing seven specific genetic locations. The stains from the floor mat, cup and lid all had the same genetic markers as Brittany's blood. Defendant, his mother, and his sisters were all excluded as the source of the DNA in any of the stains. According to Smrz, the probability of selecting an unrelated person in the general population with the same DNA type would be 1 in 310,000,000 of

the black population, 1 in 106,000 of the Caucasian population, 1 in 140,000 of the southeastern Hispanic population, and 1 in 140,000 of the southwestern Hispanic population. Smrz also performed RFLP DNA testing on the stain from the cup. The DNA profile matched that of Brittany at the four genetic locales that were used. Defendant, his mother, and his sisters were excluded as the source of the DNA. According to Smrz, the probability of someone unrelated having the same DNA profile was 1 in 84,000,000 blacks, 1 in 12,000,000 Caucasians, 1 in 6,400,000 southeastern Hispanics, and 1 in 27,000,000 southwestern Hispanics. Smrz stated that any source of blood from the body, including blood from vaginal tears, could account for the blood found in the Lincoln. Smrz also stated that she could not determine when the blood got onto the floor mat, cup, and lid.

An FBI fingerprint specialist testified that she compared defendant's palm print to a latent print on the lid of the McDonald's cup that the police found in the Lincoln. She determined that defendant was the source of the print on the lid. The specialist could not determine the age of the print on the lid.

Various testimony was presented at trial in relation to the McDonald's cup and the blood found in the Lincoln. Jewel Howlett, Brittany's stepgrandmother, testified that Wendi and Brittany visited her house about 3 p.m. on May 8, 1997. According to Jewel, both Wendi and Brittany had a drink in a McDonald's cup. Brittany emptied her cup and left it at Jewel's house. At approximately 3:45 p.m., as Wendi and Brittany left Jewel's house, Wendi gave her own cup to Brittany and told her that she could finish its contents. That cup, Jewel stated, looked like the one which the police recovered from the Lincoln.

At trial, Wendi testified that she could not recall if she went to Jewel's home on the afternoon of May 8,

1997. She also stated that, on the night of May 7, she, Brittany and defendant bought medium-size drinks from McDonald's, while in the Lincoln. Brittany was in the backseat. According to Wendi, defendant received all the cups from the drive-thru window and passed them out. However, a McHenry County sheriff's officer testified that Wendi told him that Brittany was last in the Lincoln on May 2 or May 5, 1997. Wendi also told the police that she could not explain how defendant's palm print and Brittany's blood got on the McDonald's cup and lid, but that the cup was the one from the last meal she had with Brittany on May 8.

Wendi, her husband Scott, and Florence Milka all testified that Brittany suffered from frequent nosebleeds. Florence testified that Brittany had a nosebleed in the Lincoln about two weeks before May 8, 1997, and that the rug in the car was not shampooed afterwards. However, a police officer testified that Florence told him that the nosebleed occurred in March 1997, that Brittany was sitting in the front seat at the time, and that the car had been "cleaned out" prior to May 8, 1997.

After the State presented its case in chief, the prosecutor nol-prossed counts II (felony murder predicated on aggravated kidnapping), IV (predatory criminal sexual assault of a child), and V (aggravated kidnapping) of the indictment. At the close of trial, defendant was found not guilty on count I (knowing murder), but guilty on count III (felony murder predicated on predatory criminal sexual assault of a child). Because Brittany was less than 12 years old, the court sentenced defendant to an extended term of 75 years' imprisonment (730 ILCS 5/5—8—2(a)(1), 5—5—3.2(b)(4)(i) (West 1996)).

On appeal, the appellate court rejected defendant's contention that the bar to double jeopardy had been violated in his case and that the evidence was insufficient to support his conviction. However, the appellate court

agreed with defendant that his extended-term sentence was the result of an improper double enhancement. Accordingly, the court affirmed defendant's conviction, vacated his sentence, and remanded the cause for resentencing. 336 Ill. App. 3d 206. Defendant appealed to this court and the State requested cross-relief.

## ANALYSIS

Before this court, defendant's principal contention is that the statutory and constitutional bars to double jeopardy were violated when, after the State nol-prossed the charge of predatory criminal sexual assault of a child, the jury convicted defendant of felony murder predicated on that offense. The defendant also contends that the evidence adduced at trial was insufficient to support his conviction. The State, in its request for cross-relief, challenges the appellate court's holding that defendant's extended-term sentence was based on an impermissible double enhancement. We first consider defendant's double jeopardy argument.

### Double Jeopardy

The fifth amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const., amend. V. The fifth amendment's double jeopardy bar is applicable to the states through the fourteenth amendment. *Benton v. Maryland*, 395 U.S. 784, 787, 23 L. Ed. 2d 707, 711, 89 S. Ct. 2056, 2058 (1969). The Illinois Constitution also protects an accused from twice being placed in jeopardy for the same offense. Ill. Const. 1970, art. I, § 10.

The underlying idea of the constitutional bar against double jeopardy, "one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual

for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." *Green v. United States*, 355 U.S. 184, 187-88, 2 L. Ed. 2d 199, 204, 78 S. Ct. 221, 223 (1957); *People v. Daniels*, 187 Ill. 2d 301, 309 (1999). The constitutional bar against double jeopardy provides a criminal defendant three basic protections. "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 664-65, 89 S. Ct. 2072, 2076 (1969); *People v. Levin*, 157 Ill. 2d 138, 143-44 (1993). The bar against double jeopardy also finds expression in the Illinois Criminal Code. Section 3—4(a) of the Criminal Code of 1961 states, in relevant part:

> "A prosecution is barred if the defendant was formerly prosecuted for the same offense, based upon the same facts, if such former prosecution:
>
>> (1) Resulted in either a conviction or an acquittal or in a determination that the evidence was insufficient to warrant a conviction; or
>> ***
>> (3) Was terminated improperly after the jury was impaneled and sworn or, in a trial before a court without a jury, after the first witness was sworn but before findings were rendered by the trier of facts, or after a plea of guilty was accepted by the court." 720 ILCS 5/3—4 (West 1996).

The purposes of the statutory and constitutional bars against double jeopardy have been effectuated through various rules that specify when the bars prevent further prosecution. *People v. Knaff*, 196 Ill. 2d 460, 468 (2001). "But those rules should not be applied mechanically when the interests they protect are not endangered and

when their mechanical application would frustrate society's interest in enforcing its criminal laws." *Knaff*, 196 Ill. 2d at 468-69; *People v. Ortiz*, 151 Ill. 2d 1, 10 (1992); *People v. Deems*, 81 Ill. 2d 384, 388 (1980).

In the present case, the prosecutor nol-prossed count IV of the indictment (predatory criminal sexual assault of a child) at the close of the State's case in chief. The prosecutor stated that he was doing so "in order to avoid possible confusion on jury deliberation" and to "simplify the issues before the trier of fact." Thereafter, count III of the indictment (felony murder predicated on predatory criminal sexual assault of a child) was submitted to the jury and defendant was found guilty of that offense. Defendant now contends that the State's entry of a *nolle prosequi* on the charge of predatory criminal sexual assault of a child was the functional equivalent of an acquittal, and that his conviction for felony murder based on that felony violated the bar against double jeopardy.

In support of his double jeopardy argument, defendant offers the following. Defendant observes that jeopardy attached with respect to count IV once the jury was empaneled and sworn. *People v. Bellmyer*, 199 Ill. 2d 529, 538 (2002). Citing to section 3—4(a)(3) of the Criminal Code (720 ILCS 5/3—4(a)(3) (West 1996)), defendant further observes that, once jeopardy attached, an improper termination of the prosecution of count IV resulted in a bar to subsequent proceedings for the same offense on the basis of the same facts. Defendant also notes this court's holding that the entry of a *nolle prosequi* after jeopardy attaches "has the same effect as an acquittal, and the State may not pursue those charges in a subsequent trial." *Daniels*, 187 Ill. 2d at 312. Defendant contends that this principle is incorporated within section 3—4(a)(3) and that a *nolle prosequi* is an improper termination for purposes of that statute. In addition, defendant maintains that counts III and IV were both

based on the same facts, for purposes of section 3—4(a), since both counts required proof of the elements of predatory criminal sexual assault of a child. Finally, citing to *People v. Harris*, 132 Ill. 2d 366 (1989), defendant contends that it makes no difference that his double jeopardy argument is addressed to matters which took place within a single trial. As defendant observes, in *Harris*, this court recognized that an acquittal for a felony would bar a conviction for felony murder predicated on that felony in the same trial. *Harris*, 132 Ill. 2d at 392.

As noted, the appellate court rejected defendant's double jeopardy argument. The appellate court found dispositive the fact that a *nolle prosequi* does not " 'actually acquit' " a defendant of guilt for the crime charged. 336 Ill. App. 3d at 226, quoting *Daniels*, 187 Ill. 2d at 319. As this court has explained:

> " ' "A *nolle prosequi* is not a final disposition of the case, and will not bar another prosecution for the same offense. It is not an acquittal, but it is like a nonsuit or discontinuance in a civil suit, and leaves the matter in the same condition in which it was before the commencement of the prosecution." [Citation.] *** [T]he ordinary effect of a *nolle prosequi* is to terminate the charge to which it is entered and to permit the defendant to go wherever he pleases, without entering into a recognizance to appear at any other time.' " *Daniels*, 187 Ill. 2d at 312, quoting *People v. Watson*, 394 Ill. 177, 179 (1946).

The appellate court distinguished *Harris* based on the fact that the trial court in that case had directed a verdict in favor of the defendant on the predicate felony. Such a judgment resolved the question of the defendant's factual guilt or innocence and, hence, constituted an "actual acquittal." In this case, however, as the appellate court noted, "the 'acquittal' was the result of a *nolleprosequi*, rather than a lack of sufficient evidence." 336 Ill. App. 3d at 225. The appellate court rejected defendant's contention "that an acquittal is an acquittal" (336 Ill. App. 3d at 225), and concluded that the State's entry

of a *nolle prosequi* of count IV did not prevent it from proceeding on count III. 336 Ill. App. 3d at 225.

Before this court, the State offers an additional rationale in support of the appellate court's judgment. The State contends that the prosecutor's dismissal of count IV simply had no bearing on count III. According to the State, "[t]he prosecutor's action did not absolve the defendant of liability for the [felony-murder] offense, or otherwise terminate the ongoing prosecution for the offense, when the defendant remained charged under a separate count." In the view of the State, "*nolle prossing* a duplicative charge does not constitute an acquittal, when the defendant remained charged with the same offense in a separate count of the indictment." Therefore, according to the State, defendant's argument should be rejected.

Defendant, responding to the positions taken by the appellate court and the State, contends that both are misplaced. Defendant asserts that both the appellate court and the State fail to take into account the rule, incorporated in section 3—4(a)(3), which states that a *nolle prosequi*, entered after jeopardy has attached, "has the same effect as an acquittal." *Daniels*, 187 Ill. 2d at 312. Defendant maintains that there is no authority for the proposition that a *nolle prosequi* does not effectively constitute an acquittal under the facts of this case and, therefore, that his felony-murder conviction was obtained in violation of the double jeopardy bar. We disagree.

In *Bynum v. State of Maryland*, 277 Md. 703, 357 A.2d 339 (1976), the Court of Appeals of Maryland, the court of last resort in that state, was confronted with a situation factually similar to the one in the case at bar. In *Bynum*, the defendant was charged with, *inter alia*, simple robbery and armed robbery. At the close of evidence, the State entered a *nolle prosequi* to the charge of simple robbery. The case was submitted to the jury on

the armed robbery count and a verdict of guilty was returned. *Bynum*, 277 Md. at 704-05, 357 A.2d at 340.

On appeal, the defendant maintained that the effect of submitting the armed robbery count to the jury after entry of the *nolle prosequi* on the lesser-included offense of simple robbery was to place defendant in jeopardy for a second time. The Maryland court rejected this argument:

"There is, nevertheless, a fundamental flaw in appellant's claim that he was twice placed in jeopardy. Double jeopardy is not suffered unless a man is twice put to trial. *See Bowie v. State*, 234 Md. 585, 593, 200 A.2d 557, *cert. denied*, 379 U.S. 864 (1964); Fisher, *Double Jeopardy: Six Common Boners Summarized*, 15 U.C.L.A. L. Rev. 81, 86 (1967). The purpose of the prohibition of double jeopardy, questions of double punishment aside, finds expression in the maxim *nemo debet bis vexari pro una et eadem causa*, no one shall be twice vexed for one and the same cause. In the context of a case such as this, where the defendant claims that his conviction was barred by a previous acquittal, two basic double jeopardy policies are involved. The first is the notion that guilt should be established only by proving the elements of the offense to a single jury, that the prosecution should be denied the right to increase the probability of obtaining a conviction by repeated prosecutions. And the second, more general policy, one involved in a trial subsequent to either an acquittal or a conviction, is the right not to be subject to harassment. More specifically, a defendant is not to be put to the expense of defending himself in successive unnecessary trials of the same issue, subjected to the stigma which attaches in further criminal prosecutions, or denied the psychological security, available in civil cases by reason of the doctrine of res judicata, of considering a matter once tried to be closed. *See* Comment, *Twice in Jeopardy*, 75 Yale L.J. 262, 266-67 (1965); Comment, 65 Yale L.J. 339, 340-41 (1956).

It is evident that where, as here, the defendant is subjected to but a single prosecution, trial and jury verdict, there exists none of the evils which the double jeopardy prohibition is intended to prevent. Appellant has neither

been harassed by multiple prosecutions, nor has he been subjected to the increased probability of conviction attendant upon repeated trials. In short, appellant was but once placed in jeopardy." *Bynum*, 277 Md. at 707-08, 357 A.2d at 341-42.

In a subsequent case, *Ward v. State of Maryland*, 290 Md. 76, 427 A.2d 1008 (1981), the Court of Appeals of Maryland explored in depth the meaning of "the often repeated statement that a nolle prosequi, after jeopardy attaches and without the defendant's consent, 'operates as an acquittal.'" *Ward*, 290 Md. at 82, 427 A.2d at 1012. Discussing this issue, the Maryland court observed that

"[t]he proposition that a nolle prosequi, without the defendant's consent, 'amounts to' or is 'tantamount to' or is the 'equivalent of' or 'operates as' an acquittal if it is entered after the attachment of jeopardy, is not a characteristic of a nolle prosequi itself. Instead, the proposition originated with, and is an aspect of, a body of double jeopardy law which developed in several nineteenth century American cases, both under American common law double jeopardy principles and under the Fifth Amendment." *Ward*, 290 Md. at 85, 427 A.2d at 1013.

Discussing in particular an 1830 case from South Carolina, *State v. M'Kee*, 17 S.C.L. (1 Bail.) 651 (S.C. 1830), and an 1840 decision from Illinois, *United States v. Shoemaker*, 27 F. Cas. 1067 (C.C.D. Ill. 1840) (No. 16,279), the *Ward* court noted that

"in several American jurisdictions, the principle developed that, because the defendant was entitled to a verdict once the trial began, if the trial (or portion of the trial relating to a particular offense) were aborted by certain actions of the court or prosecutor without the defendant's consent, thereby depriving him of his right to a verdict, then the prohibition against double jeopardy would preclude a *subsequent* trial. This principle was applied when the trial was aborted either by the prosecutor's entering a nolle prosequi or otherwise abandoning the prosecution, or by the court's declaring a mistrial without a 'manifest necessity' for so doing (whether *sua sponte* or upon the prosecutor's motion)." *Ward*, 290 Md. at 85-86, 427 A.2d at 1013-14.

The *Ward* court went on to state:

"As reviewed above, the statement that a nolle prosequi, without the defendant's consent and after jeopardy attaches, 'amounts to an acquittal' of the underlying offense, originated as an application of the same double jeopardy principle which prevents a retrial after an unconsented and unnecessary mistrial. In accordance with its origins, the proposition that an unconsented nolle prosequi after jeopardy attaches 'operates as an acquittal' has been applied to prevent trials only when that result is dictated by the prohibition against double jeopardy. The cases hold that, under circumstances where a continuation of a trial or a new trial for the same offense would not be precluded by double jeopardy principles, it is not precluded by the entry of a nolle prosequi." *Ward*, 290 Md. at 91-92, 427 A.2d at 1017.

The *Ward* court also observed that "the virtually unanimous view" is that a *nolle prosequi* of a lesser-included charge entered after jeopardy attaches does not preclude prosecution of the greater charge, and, moreover, that a *nolle prosequi* of one count after jeopardy attaches has no bearing upon another count charging the same offense. *Ward*, 290 Md. at 92-93, 427 A.2d at 1017-18 (and cases cited therein).

*Bynum* and *Ward* are persuasive opinions and are in accord with decisions of this court. As noted, this court has long held that, while a *nolle prosequi* discharges a defendant on the charging document or count which was nol-prossed, there is nothing inherent in the *nolle prosequi* itself which causes it to operate as an acquittal. See *Daniels*, 187 Ill. 2d at 312 (a *nolle prosequi* " ' "is not an acquittal" ' "), quoting *Watson*, 394 Ill. at 179. To be sure, this court has held that the nol-pros of a charge, entered after jeopardy has attached, bars prosecution of that charge "in a subsequent trial." *Daniels*, 187 Ill. 2d at 312. However, this result is dictated not by the nature of the *nolle prosequi* itself, but by double jeopardy principles, since a subsequent prosecution would deprive

defendant of his right to have the first jury, once empaneled, render a verdict. See, *e.g.*, *Ward*, 290 Md. at 94, 427 A.2d at 1018 ("cases actually holding that a nolle pros or abandonment of a charge or count was equivalent to an acquittal of the underlying offense all involved a second trial which would have been barred by [double jeopardy principles]"). Further, defendant has not cited, and our research has not uncovered, any decision of this court which holds to the contrary of the Maryland courts' reasoning, *i.e.*, that the entry of a *nolle prosequi* operates as an acquittal in all circumstances. Indeed, the Maryland courts' analysis, which gives primacy to the principles which underlie the bar against double jeopardy, is in accord with this court's long-standing position that double jeopardy rules are not to be applied in a mechanical fashion. *Knaff*, 196 Ill. 2d at 468-69.

Applying the reasoning of *Bynum* and *Ward* to the facts at bar, it is clear that defendant's double jeopardy argument fails. The *nolle prosequi* entered on count IV was not an acquittal of the charge of predatory criminal sexual assault of a child. See *Daniels*, 187 Ill. 2d at 312. Moreover, defendant has not identified any interest protected by the bar against double jeopardy which would require that the *nolle prosequi* in this case be held to have "the effect of an acquittal" or "to operate as an acquittal." Defendant was not, for example, deprived of his right to have a single jury, once sworn and empaneled, decide the question of whether he committed predatory criminal sexual assault of a child. Nor was he subject to harassment by the State, disruption of his trial, or any other prejudicial effect. We hold, therefore, that under the facts of this case, the State's entry of a *nolle prosequi* as to count IV did not "operate as an acquittal" or "have the effect of an acquittal" so as to preclude continuation of the trial on count III. Accordingly, we reject defendant's argument that the bar against double jeopardy was violated in this case.

### Sufficiency of the Evidence

Defendant contends that the evidence adduced at trial was insufficient to prove, beyond a reasonable doubt, that he was the person who caused Brittany Martinez's death.

When considering a challenge to the sufficiency of the evidence on appeal, it is not the function of the reviewing court to retry the defendant. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, the relevant question is "whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *People v. Perez*, 189 Ill. 2d 254, 265-66 (2000). The weight to be given witnesses' testimony, the witnesses' credibility, and the reasonable inferences to be drawn from the evidence, are all the responsibility of the fact finder. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). In addition, circumstantial evidence is sufficient to sustain a criminal conviction, so long as the elements of the crime have been proven beyond a reasonable doubt. *People v. Gilliam*, 172 Ill. 2d 484, 515 (1996). "The trier of fact need not, however, be satisfied beyond a reasonable doubt as to each link in the chain of circumstances. It is sufficient if all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt." *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

On appeal, defendant challenges several aspects of the State's case, alleging that weaknesses in the State's evidence render the case against him so unsatisfactory as to leave a reasonable doubt of his guilt. We disagree. Defendant's argument regarding the sufficiency of the evidence is ultimately unpersuasive because, as the appellate court below noted, the weaknesses in the evidence that defendant cites on appeal were all presented to, and rejected by, the jury.

For example, defendant contends that the record raises serious questions about his ability to have carried

out the murder and sexual assault in the manner and time frame advanced by the State. At trial, the State argued the following version of events to the jury. According to the State, defendant arrived at Brittany's apartment at approximately 6 p.m. on May 8, 1997. Brittany entered the Lincoln Towncar driven by defendant. Defendant performed an act of sexual penetration upon Brittany, murdered her by asphyxiation, and then disposed of her body by throwing it off the Hemmingson Road bridge near Union. Defendant returned to Elgin, stopping by the W.J. Dennis building to pick up cleaning supplies in an attempt to establish an alibi. Defendant then drove to the Howlett's apartment building, arriving shortly after 9 p.m., and joining in the search for Brittany.

Defendant contends that the time frame advanced by the State, *i.e.*, approximately three hours, was "very limited" and that there is a serious question as to whether defendant, who had "limited mental abilities," could have carried out the crime in that amount of time. At trial, however, this argument was contested by the State. Before the jury, the State contended that it did not take exceptional intelligence to have committed Brittany's murder. The State also expressly contested the notion that defendant had mental limitations that would have prevented him from committing the murder. The State noted that defendant had graduated from high school, had a driver's license, and held two jobs. Further, the jury heard evidence that the drive between Elgin and Union took between 30 and 40 minutes. Thus, at a maximum, defendant would have spent only 1 hour and 20 minutes driving between the two points. This allowed a minimum of 1 hour and 40 minutes for him to complete the act of sexual penetration, dispose of the body, and pick up some cleaning supplies to make it appear that he had been working. Given these facts, we cannot say that

the jury's conclusion that defendant had both the capability and sufficient time to carry out the crime was so unreasonable that it must be rejected on appeal.

Defendant also contends that his statement to the police describing the whereabouts of Brittany's body "cannot fairly be taken to demonstrate" his guilt because they were prompted by a police detective's suggestion that defendant imagine where Brittany was. Defendant argues that such "imaginings" by defendant do not constitute reliable incriminatory evidence. In addition, defendant points out that his mother testified that she reported a psychic saying that Brittany was dead in a wooded area near a bridge and was cold and wet. Thus, according to defendant, the record strongly supports the inference that defendant, with his limited intelligence, was repeating the vision recounted by the psychic. Again, however, these arguments, which go to the weight of the evidence, were made to, and rejected by, the jury. No psychic testified at trial, and the State expressly argued to the jury that the testimony of defendant's family members describing the psychic's vision, and the fact that defendant heard about that vision, was not credible. The family members, according to the State, were trying to protect defendant. The jury's rejection of the family members' testimony is a credibility determination that we may not disturb. Moreover, defendant's statement describing the location of Brittany's body did correspond to the facts. Defendant stated that Brittany was cold and wet and was not breathing. He also stated that she was near a white farmhouse, farmland, a bridge, rocks, water and a creek. When Brittany's body was discovered, it was, in fact, wet and cold, and Brittany was not breathing. In addition, the body was, in fact, found near a white farmhouse, farmland, a bridge, rocks, water and a creek. The jury's conclusion that defendant accurately described the location of Brittany's body, and that he did so on the

basis of personal knowledge, was supported by the evidence and cannot be rejected on appeal.

Defendant also challenges the significance of any inconsistent statements that he gave to the police. While defendant concedes that he lied to the police concerning his whereabouts during the time the State maintained that the crime was taking place, he argues that any false statements he made were of little significance since his accounts of his activities on May 8 were all exculpatory. We disagree.

A false exculpatory statement is "probative of a defendant's consciousness of guilt." *People v. Shaw*, 278 Ill. App. 3d 939, 951 (1996); *People v. Muhammad*, 257 Ill. App. 3d 359, 368 (1993); *People v. Seawright*, 228 Ill. App. 3d 939, 969 (1992). In this case, an important aspect of the State's theory of the case was that defendant killed Brittany between the time he left Wendi's apartment building, at approximately 6:15 p.m., and the time he returned, at about 9 p.m. Thus, defendant's whereabouts during that period were critical. However, defendant never gave a consistent explanation as to his activities during that time.

As the appellate court below observed, in his first statement to the police, in the early morning hours of May 9, 1997, defendant stated that, after leaving Wendi's apartment building, he stopped at the Speedway station and bought cigarettes. But in his interview on May 10, 1997, he stated that he went directly to W.J. Dennis. Defendant told police that he saw a white Cadillac parked in front of W.J. Dennis on the evening of May 8, but the executive from that firm testified that no such car was there that night. Defendant told police during his interview on May 10 that he parked in a lot east of the W.J. Dennis building but recanted that statement when told of a surveillance video. Defendant stated on May 9 that he entered W.J. Dennis about 7:30 p.m., but stated

on May 10 that he entered at about 8:15. That difference was important, because the executive from W.J. Dennis stated that defendant was not in the building when he left at 8:10 p.m. In his statement on May 9, defendant said that, after leaving W.J. Dennis, he went to a second jobsite. But on May 10, he told police that, on his way back to Wendi's building, he stopped only at the Speedway. Finally, defendant did not appear on the surveillance tape taken from the Speedway station. As the appellate court correctly concluded, the deviations noted above dealt directly with defendant's alibi, and a false alibi can be a factor in establishing guilt beyond a reasonable doubt. *People v. Martin*, 80 Ill. App. 3d 281, 297 (1979).

Defendant also maintains that the State's forensic evidence did not establish that Brittany died during the 6 to 9 p.m. period on May 8, 1997, in which the State contended the crime occurred. The State's expert testimony regarding entomological evidence narrowed the time frame of Brittany's death to no later than the afternoon of May 9. Defendant contests the accuracy of this evidence. Once again, however, the weight to be given the testimony was a matter for the jury, not this court. In addition, the forensic pathologist who performed the autopsy on Brittany's body testified that, two or three hours before she died, Brittany ate what appeared to be chicken, mixed fruit, including peaches and pears, and french fried potatoes. Wendi testified that Brittany ate chicken nuggets and french fries at about 4 p.m. on May 8. Also, although Wendi denied making this statement at trial, a police officer testified that she told him that Brittany had eaten a bowl or cup of peaches on the afternoon of May 8. Defendant counters that, even if true, "the discernable pears in the decedent's stomach remain unexplained by the State" and, therefore, the stomach contents failed to confine the time of death to that

theorized by the State. We cannot agree. Nothing about the absence of fruit from Brittany's stomach was inconsistent with the State's position regarding the time of death. Viewing the evidence in the light most favorable to the State, we cannot say that the jury was precluded from drawing the inference that the chicken and french fried potatoes in Brittany's stomach were those she had eaten at approximately 4 p.m. on May 8. That inference placed the time of Brittany's death within the time period advanced by the State.

Finally, defendant disputes the importance of the fact that Brittany's blood was found in the Lincoln driven by defendant. Defendant notes that there was testimony at trial that Brittany suffered from frequent nosebleeds and that this could have been the source of the blood. Again, however, the credibility of this testimony was challenged by the State at trial. The jury could have reasonably inferred that the blood in the Lincoln came from the sexual assault, rather than a nosebleed.

We agree with the appellate court's disposition of defendant's argument regarding the sufficiency of the evidence. As the appellate court concluded, the evidence presented at trial, when viewed in the light most favorable to the State, allowed the jury to find that (1) defendant was the last person to see Brittany alive, (2) Brittany died between 6 p.m. and 9 p.m. on May 8, 1997, (3) defendant lied to the police regarding his whereabouts during those hours, (4) the blood in defendant's car was the result of vaginal tears suffered by Brittany, and (5) defendant accurately described the location of Brittany's body before her body was discovered. This evidence was sufficient for the jury to find, beyond a reasonable doubt, that defendant caused Brittany's death.

## Double Enhancement

The predicate offense for defendant's felony-murder conviction was predatory criminal sexual assault of a

child. The offense of predatory criminal sexual assault of a child requires proof of the following: (1) that the defendant committed an act of sexual penetration upon the victim and (2) that the defendant was 17 years of age or older and that the victim was under 13 years of age when the act was committed. 720 ILCS 5/12—14.1(a)(1) (West 1996). At sentencing, the trial court imposed an extended-term sentence, under section 5—5—3.2(b)(4)(i) of the Unified Code of Corrections (730 ILCS 5—5—3.2(b)(4)(i) (West 1996)), based on the fact that Brittany was under the age of 12 at the time of her death.

In the appellate court, defendant maintained that his extended-term sentence was the result of an improper double enhancement because the fact which rendered him eligible for an extended-term sentence, Brittany's age, was also an element of the predicate offense for his felony-murder conviction. The appellate court agreed with defendant. The court vacated defendant's sentence and remanded the cause for resentencing. In so holding, the appellate court relied on this court's decision in *People v. Ferguson*, 132 Ill. 2d 86 (1989).

At issue in each of the three consolidated cases before this court in *Ferguson* was whether the age of the victim could be considered as an enhancing factor qualifying the defendant for an extended-term sentence, when age was also an element of the offense for which each defendant had been convicted and sentenced. This court recognized that, in general, a factor implicit in the offense for which a defendant has been convicted cannot be used as an aggravating factor in sentencing for that offense, absent a clear legislative intent to allow such use of the factor. *Ferguson*, 132 Ill. 2d at 97. This rule, we stated, was based on the reasoning that the legislature must have necessarily considered such implicit factors in classifying the offense and setting the sentencing range. *Ferguson*, 132 Ill. 2d at 97, citing *People v. White*, 114 Ill. 2d 61, 66

(1986). We further noted that where there is ambiguity with regard to whether the legislature intended to permit double enhancement on the basis of a factor already implicit in an offense, the rule of lenity, under which statutes are construed in a criminal defendant's favor, may apply. *Ferguson*, 132 Ill. 2d at 97-98.

Applying the above-stated principles, this court found the statutes at issue in *Ferguson* to be ambiguous regarding the imposition of an extended term on the basis of the victim's age, where the victim's age was also an element of the charged offense. We applied the rule of lenity and held that the age of the victim could not be considered as a basis for imposition of an extended term where the age of the victim was an element of the offense. *Ferguson*, 132 Ill. 2d at 98. In so holding, we also declined to apply a then-recent legislative amendment which indicated that an extended-term sentence could be imposed on a defendant who committed aggravated sexual assault against a minor. That amendment, we concluded, was a change in the law that did not apply to the defendants at bar. *Ferguson*, 132 Ill. 2d at 98-99.

Applying *Ferguson*, the appellate court in the present case concluded that defendant's sentence was the result of an impermissible double enhancement. The appellate court noted that, as an element of the predicate offense, Brittany's age exposed defendant to a sentence for felony murder, or 20 to 60 years' imprisonment. 730 ILCS 5/5—8—1(a)(1)(a) (West 1996). Then, Brittany's age exposed defendant to an extended-term sentence for felony murder, or 60 to 100 years' imprisonment. 730 ILCS 5/5—8—2(a)(1) (West 1996). According to the appellate court, this was "the very definition of a double enhancement." 336 Ill. App. 3d at 236. The appellate court also noted that the current version of section 5—5—3.2 provides that an extended-term sentence may be imposed on a defendant convicted of predatory criminal sexual as-

sault of a child. 730 ILCS 5/5—5—3.2(c) (West 2000). However, relying on *Ferguson*, the appellate court concluded that the current version of section 5—5—3.2 was not applicable to defendant. 336 Ill. App. 3d at 236. In accordance with *Ferguson*, the appellate court vacated defendant's extended-term sentence and remanded the cause for resentencing.

In its cross-appeal before this court, the State challenges the appellate court's holding that defendant's extended-term sentence was invalid. However, the State does not cite to, or attempt to distinguish, this court's holding in *Ferguson*. Instead, the State argues more generally that, in setting the sentencing range for felony murder, the legislature did not take into consideration the many elements that make up the particular underlying felonies. According to the State, "the legislature did not set the penalty [for felony murder] in contemplation that the murder [in this case] would have been committed on a victim of a young age." Therefore, the State argues, there was no consideration of the enhancing factor, *i.e.*, the age of the victim, in setting the original sentencing range at issue in this case, and that factor could be weighed at sentencing. We disagree.

To be guilty of felony murder, a defendant must commit a predicate, "forcible felony." 720 ILCS 5/9—1(a)(3) (West 1996). Predatory criminal sexual assault of a child, although a felony offense, is not, on its face, a forcible felony. To prove a defendant guilty of predatory criminal sexual assault of a child, the State must establish that the defendant committed an act of sexual penetration upon the victim, that the defendant was 17 years of age or older and that the victim was under 13 years of age when the act was committed. 720 ILCS 5/12—14.1(a)(1) (West 1996). The State need not prove, however, that physical force or violence, or the threat of physical force or violence, was used during the sexual penetration.

To ensure that in those cases where a defendant commits predatory criminal sexual assault of a child and death results the defendant may be prosecuted for felony murder, the legislature included the offense of predatory criminal sexual assault of a child in the provision of the Criminal Code which defines the term "forcible felony." 720 ILCS 5/2—8 (West 1996). Given this action on the part of the legislature, it is not reasonable to conclude, as the State contends, that the legislature gave no thought to the age of the victim when it created the offense of felony murder predicated on predatory criminal sexual assault of a child and set the penalty for that offense. Indeed, it is apparent that it was precisely because of the age of the victims involved, and because of the desire to protect children from harm, that the legislature defined predatory criminal sexual assault of a child as a forcible felony, thereby making clear that the offense could serve as a predicate felony for felony murder.

In light of the foregoing, and in accord with this court's decision in *Ferguson*, we agree with the appellate court that defendant's sentence was the result of an impermissible double enhancement. We affirm the judgment of the appellate court which vacated defendant's sentence and remanded the cause for resentencing.

## CONCLUSION

For the forgoing reasons, the judgment of the appellate court, which affirmed defendant's conviction but remanded the cause to the circuit court for resentencing, is affirmed.

*Appellate court judgment affirmed.*