2022 IL App (1st) 201327-U

FIFTH DIVISION
MARCH 11, 2022

No. 1-20-1327

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 16 CR 17213 |
| | ) | |
| RODNEY HARBIN, | ) | Honorable |
| | ) | Joseph M. Claps, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Justices Hoffman and Connors concurred in the judgment.

ORDER

¶ 1   *Held*: The defendant's conviction is affirmed where the trial court gave an appropriate answer to the jury's question; the trial court did not err by accepting inconsistent verdicts; the State proved the defendant guilty beyond a reasonable doubt; his constitutional right against double jeopardy was not violated; and his due process argument is forfeited.

¶ 2   On November 23, 2016, the State charged the defendant-appellant, Rodney Harbin, by information with 26 counts of murder, 4 counts of attempted murder, 6 counts of attempted aggravated vehicular hijacking, 3 counts of attempted armed robbery, and 3 counts of aggravated

discharge of a firearm. On February 13, 2018, Mr. Harbin filed a motion pursuant to *People v. Lynch*, 104 Ill. 2d 194 (1984), seeking to introduce evidence of the victim's aggressive behavior. The trial court granted the motion. On May 7, 2019, Mr. Harbin filed an amended answer to discovery, listing self-defense as an affirmative defense. The State then voluntarily dismissed all counts of the indictment except for two counts of first degree felony murder and a count of attempted armed robbery. Following a jury trial, Mr. Harbin was convicted of one count of first degree felony murder. On October 26, 2020, Mr. Harbin was sentenced to 50 years' imprisonment. On appeal, Mr. Harbin argues that: the court erred by not directly answering the jury's question on an explicit area of law; the court erred by letting inconsistent verdicts stand; the evidence was insufficient for conviction; the court erred by violating Mr. Harbin's right against double jeopardy; and Mr. Harbin's conviction violated his due process rights. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                                     BACKGROUND

¶ 4      On November 23, 2016, the State charged Rodney Harbin by information with 42 criminal counts, which included first degree murder, attempted murder, attempted armed robbery, attempted aggravated vehicular hijacking, and aggravated discharge of a firearm. The charges arose out of a shooting incident that occurred during the early morning hours of September 21, 2016, which resulted in the deaths of Miguel Williams and Donald Brunson. On February 13, 2018, Mr. Harbin filed a *Lynch* motion[1], seeking to introduce evidence of Miguel Williams'

---

[1]A *Lynch* motion seeks to allow a defendant to introduce evidence of the victim's aggressive or violent character to show either that the defendant's knowledge of the victim's violent tendencies affected his perception and reaction to the victim's behavior, or to support the defendant's version of events where there are conflicting accounts of what happened. *People v. Figueroa*, 381 Ill. App. 3d 828, 844 (2008).

character and propensity for violence. The trial court granted Mr. Harbin's motion. On May 17, 2019, Mr. Harbin filed an amended answer asserting an affirmative defense of self-defense.

¶ 5    As a result, the State decided that the counts of first degree murder under a theory of knowing and intentional murder would not proceed and instead be subject to the process of *nolle prossequi*. The State planned to proceed only on the two first degree felony murder counts and the predicate offense of attempted armed robbery. The trial court granted the State's request.

¶ 6    On November 19, 2019, a jury trial commenced. The State called eight witnesses: including Diane Webster, who is Miguel Williams' mother, Juan Jackson, Chicago police officer Androniki Ganczewski, Dr. Ponni Arunkumar, Chicago police detective Joseph McGuire, Chicago police officer Keith Connolly, Illinois State Police firearm analyst Cari Nudera, and Illinois State Police forensic scientist Scott Rochowicz. Ms. Webster testified briefly about her son, Miguel Williams' life. The State next called occurrence witness, Juan Jackson.

¶ 7    Mr. Jackson testified that he had been childhood friends with Miguel Williams. On September 20, 2016, he drove to the Halsted Bowl, a bowling alley, with Miguel Williams and another friend, Rickey Wilkens. They were attending a party of a social club, of which Mr. Jackson was president. Mr. Jackson drove his sports utility vehicle (SUV), with clear side windows in the front and tinted side windows in the back, to the bowling alley, arriving around 10:45 p.m. Mr. Wilkens was in the front passenger seat of the vehicle and Miguel Williams sat behind Mr. Jackson in the backseat on the driver's side. When the three men arrived at the bowling alley, Mr. Wilkens and Mr. Jackson exited the car to go to the party, which was both indoors and outdoors. Miguel Williams stayed behind in the backseat of the SUV because his leg was in a cast from a gunshot wound to his foot. While Miguel Williams sat in the backseat, the tinted black windows were rolled

up. After Mr. Jackson exited the SUV, he stayed outside of the bowling alley since "[i]t was hot [inside the bowling alley] and [he] didn't want to deal with" being inside. After being outside and talking to people for about 15 minutes, he saw Mr. Harbin, whom he knew as "Dakota."

¶ 8    Mr. Jackson testified that Mr. Harbin had been "[r]unning around [the bowling alley], making threats, being a bully." According to Mr. Jackson, Mr. Harbin was upset that a gun was missing from the home of his girlfriend, Roymania Gipson. Mr. Harbin was also angry about a fight between Ms. Gipson, Mr. Wilken's girlfriend, and another woman. Mr. Harbin said he would fight anyone at the party. Mr. Jackson further testified he had been at the bowling alley for about 45 minutes to an hour when he saw someone pass a gun to Mr. Harbin, which Mr. Harbin put on his hip. At the same time that someone passed a gun to Mr. Harbin, Mr. Jackson and Mr. Wilkens walked back to the SUV and sat down inside. While they were seated in the SUV, they heard Mr. Harbin, who was walking towards them, say that he would kill Miguel Williams if he saw him. At that time, Mr. Harbin did not know Miguel Williams was seated in the backseat of the SUV. Then, Mr. Harbin stepped off the curb and pointed a gun at Mr. Jackson's head, saying he could not believe that he showed up there and that he should kill him. Mr. Harbin then demanded, at gunpoint, Mr. Jackson's Forgiato wheel rims from the tires of his SUV. The rims cost approximately $10,000. In that same moment, two gunshots were fired from the backseat of Mr. Jackson's SUV. Mr. Jackson presumed it was Miguel Williams shooting. Mr. Harbin turned the gun toward the backseat of the SUV and fired six to seven gunshots. Then, Mr. Harbin ran towards the bowling alley. As Mr. Jackson started his car to drive away, Mr. Harbin turned around and fired five to six more gunshots at the front of the SUV. When Mr. Jackson drove away, he saw Mr. Harbin fleeing from the bowling alley. While Mr. Jackson, Mr. Wilkens, and Miguel Williams

were driving away from the bowling alley, Miguel Williams suddenly stopped talking from the backseat. Once Mr. Jackson heard Miguel Williams stop talking, he pulled into a gas station to check on him and flag down the police. When he went to the backseat to look at Miguel Williams, he saw a firearm magazine in the backseat with ammunition in it. Mr. Jackson grabbed the firearm magazine and threw it away in the gas station garbage. When Mr. Jackson later spoke to police, he did not tell them that he found the firearm magazine because he was scared. On cross-examination, Mr. Jackson mentioned that Mr. Harbin and Miguel Williams knew of each other because they were both dating the same woman, Ms. Gipson. The two men had never met in person. While he stated that Ms. Gipson and Miguel Williams had been together for 15 years, he denied that Miguel Williams had any problems with Ms. Gipson dating Mr. Harbin.

¶ 9    Miguel Williams was subsequently pronounced dead.

¶ 10    Chicago police officer Ganczewski testified next. Officer Ganczewski, while on patrol on September 21, 2016, was called to Halsted Bowl and, upon arrival, saw Donald Brunson lying on the sidewalk with a gunshot wound. Donald Brunson was transported to a hospital where he was later pronounced dead.

¶ 11    The State's next witness was Cook County Chief Medical Examiner Dr. Arunkumar. Dr. Arunkumar testified that Miguel Williams was killed by a gunshot wound to his chest.

¶ 12    The State called Chicago police detective McGuire to testify about his investigation into the shootings of Miguel Williams and Donald Brunson. Detective McGuire testified that he arrived at Halsted Bowl and saw that the area had been cordoned off with crime scene tape. Detective McGuire then went to the hospital to see Donald Brunson's body before going to the gas station, where Mr. Jackson's SUV was located. The SUV had broken windows and a pair of bullet holes

in the body. However, he did not see any firearms inside the vehicle. On cross-examination, Detective McGuire stated that, when he interviewed Mr. Jackson, Mr. Jackson did not tell him that a gun was passed to Mr. Harbin nor did he say that Mr. Harbin said to him "I can't believe you all came here for this."

¶ 13    The State also called Chicago police officer Connolly to the witness stand. Officer Connolly testified that, while working as an evidence technician on September 21, 2016, he arrived at the gas station where Mr. Jackson's SUV was located. Officer Connolly observed that Miguel Williams was deceased. He took photographs of the SUV and the surrounding area. Officer Connolly recovered a fired metal fragment from Miguel Williams' shirt and two fired bullet casings from the scene. Officer Connolly performed a street gunshot residue test on Miguel Williams' hands. Officer Connolly took photographs at the bowling alley and recovered 17 fired cartridge casings from the street and sidewalk. Officer Connolly went to the hospital from the scene, where he took photographs of the deceased, Donald Brunson. On cross-examination, Officer Connolly stated he did not look in the garbage cans near the SUV for firearms or ammunition. Officer Connolly also testified that there were no crutches seen in or recovered from the SUV.

¶ 14    The parties stipulated that, if called to testify, Dr. Dukes of the Cook County Medical Examiner's Office would state that she performed an autopsy on Donald Brunson and determined he died due to a gunshot wound through his hip.

¶ 15    Then, the State called Ms. Nudera to testify as an expert witness in firearm identification. She worked for the Illinois State Police Forensic Science Center as an analyst in firearms identification. She determined that the firearm cartridge casings recovered from Mr. Jackson's

SUV and the firearm cartridge casings recovered from the bowling alley were from different firearms. She said it was possible that up to four different firearms were used in the shootings.

¶ 16    The State called its final witness, Illinois State Police forensic scientist Mr. Rochowicz. Mr. Rochowicz stated that, in his expert opinion, based on his testing of a gunshot residue kit, Miguel Williams either discharged a firearm, was in close proximity to a discharged firearm, or touched a gunshot residue item. He stated that the gunshot residue kit performed on Miguel Williams was the only gunshot residue kit he received to examine in this case. After this witness, the State rested.

¶ 17    Mr. Harbin called Roymania Gipson as his first witness. She testified that she is engaged to Mr. Harbin and that they had been dating since April 2016. Prior to dating Mr. Harbin, she dated Miguel Williams, who helped raise her son, for nine years. That relationship ended in September 2015. Around May 2016, Miguel Williams found out about her relationship with Mr. Harbin. Miguel Williams became upset and warned her to keep Mr. Harbin away from her son. In September 2016, Miguel Williams threatened to "do something" to Mr. Harbin if Ms. Gipson continued to let her son see Mr. Harbin. She refused Miguel Williams' request for a photograph of Mr. Harbin. She told Mr. Harbin about the conversation and showed him a picture of Miguel Williams.

¶ 18    Mr. Harbin testified on his own behalf. He stated that he started dating Ms. Gipson in April 2016 and found out that Miguel Williams was a pseudo-father to her son. He did not have a problem with Miguel Williams' relationship with Ms. Gipson's son. He had never met Miguel Williams and first heard of him following Miguel Williams' threats to Ms. Gipson. The threats

escalated in September 2016. Mr. Harbin was still unfamiliar with Miguel Williams. At some point, Ms. Gipson showed him a photograph of Miguel Williams.

¶ 19    Mr. Harbin further testified that the party at the bowling alley on September 20, 2016, involved multiple social clubs. He arrived at the bowling alley at approximately 9:30 p.m. with other members of his motorcycle club. He talked with some people and went in and out of the bowling alley until midnight. At some point in the evening, he saw Mr. Wilkens and Mr. Jackson, whom he knew prior to that night. The three greeted each other and shook hands but did not converse. At approximately midnight, as he walked Mr. Brunson and a woman to the woman's car, Mr. Wilkens and Mr. Jackson called out to him. They were in a "red truck" that was parked in the through lane in front of the bowling alley. They said to Mr. Harbin, "Hey, Dakota, check it out." Mr. Harbin had not had a prior altercation with them and did not think anything was wrong with their request for him to come over. He noticed that the front windows of the truck were down and Mr. Jackson was in the driver's seat. Mr. Wilkens was in the front passenger seat. The back windows were tinted and rolled up, and he could not see into the backseat. At their request, he walked to the front of the vehicle and went to the driver's side door. Before he reached the driver's door, he heard a gunshot and saw a muzzle flash from the backseat of the truck. He was scared and backed away. He saw that Donald Brunson had just been shot on the sidewalk, and so he pulled out his firearm and shot back at the red truck. He then saw Mr. Jackson and Mr. Wilkens holding firearms. He was sure they did not fire the first shots, though, since those shots came from the backseat. Mr. Harbin hid behind another car and returned fire at the truck. He fired his gun until he was out of ammunition and then fled on his motorcycle. Mr. Harbin testified that he never indicated to Mr. Wilkens or Mr. Jackson that he was trying to steal the wheel rims off the red truck.

¶ 20    On cross-examination, Mr. Harbin denied knowledge that his girlfriend, Ms. Gipson, had been in a fight with other women and was banned from social gatherings. He did not check on Donald Brunson nor did he call the police after the shooting.

¶ 21    The defense read a stipulation into evidence regarding Chicago police detective Wade Golab's testimony. It stated that Detective Golab would testify that he interviewed Mr. Jackson during the early morning hours on September 21, 2016. Mr. Jackson never said any of the following: that Mr. Harbin said he was going to kill Miguel Williams; that Mr. Harbin said, "I can't believe you came up here for me like that"; nor that Mr. Harbin said that he was upset about the social clubs and was going to shut down all the parties. Detective Golab would also testify that he did not ask Mr. Jackson about any statements made by Mr. Harbin to Mr. Jackson and also did not send any other gunshot residue kits to the Illinois State Police for testing. After the stipulation was read into evidence, the defense rested.

¶ 22    During jury deliberations, the jury asked a question of the trial court, "Is [*sic*] the allegations contingent on agreeing with first degree murder[?] So if there is no armed robbery, is he innocent of the other allegations[?] Are they all tied together[?]" The defense initially requested that the trial court either respond to the jury with, "you need to find him guilty of [*sic*] armed robbery to find him guilty of first degree murder" or refer the jury to Illinois Pattern Jury Instructions-Criminal 7.2X, which was already part of the instructions given to the jury. The instruction previously given to the jury stated the following:

> "To sustain the charge of first degree murder, the State must prove that when the defendant performed the acts which caused the death of Miguel Williams, the defendant was attempting to commit the offense of armed robbery. Accordingly, you may find the

defendant guilty of first degree murder only if you also find the defendant guilty of attempt armed robbery.

If you find the defendant not guilty of attempt armed robbery, then you must find the defendant not guilty of first degree murder."

The trial court stated that it was unwilling to tell the jury what to do and did not want to single out one jury instruction over another. The State suggested that the court should respond, "you have all the jury instructions, refer to those. Please continue to deliberate." The defense suggested referring the jury to the specific instructions would be better. After hearing both parties, the court asked about sending a note back to the jury that would state, "Ladies and gentlemen of the jury, read the instructions, all of them, continue to deliberate." Both parties stated, "That's fine with me." The judge then sent the proposed note to the jury.

¶ 23     The jury continued to deliberate. Eventually, the jury returned a guilty verdict on the first degree felony murder count regarding the shooting of Miguel Williams but returned not guilty verdicts on the first degree felony murder count for the shooting of Donald Brunson and the attempted armed robbery count. On October 26, 2020, the trial court sentenced Mr. Harbin to 50 years' imprisonment. On November 25, 2020, Mr. Harbin filed his notice of appeal.

¶ 24                                    ANALYSIS

¶ 25     We note that we have jurisdiction to consider this matter, as Mr. Harbin filed a timely notice of appeal. See Ill. S. Ct. R. 606 (eff. July 1, 2017).

¶ 26     Mr. Harbin raises the following arguments on appeal: the trial court erred by not answering the jury's question on an explicit area of law; the trial court erred by letting inconsistent verdicts stand; the evidence was insufficient for a conviction; the trial court erred by violating Mr. Harbin's

right against double jeopardy; and Mr. Harbin's conviction violated his due process rights. We take each issue in turn.

¶ 27                                    Jury Question

¶ 28     Mr. Harbin first argues that the trial court erred by not directly answering the jury's explicit question of law. He contends that the jury's question showed confusion about the elements required for a first degree felony murder conviction in his case, which the trial court should have clarified, but did not. He asks us to reverse and remand for a new trial on that basis.

¶ 29     A trial court has a duty to instruct a jury that shows confusion or doubt about the law, where the jury has asked an explicit question or requests a clarification of the law arising from the facts. *People v. Childs*, 159 Ill. 2d 217, 229 (1994). This duty exists even in circumstances where the jury has been properly instructed. *Childs*, 159 Ill. 2d at 229. However, under appropriate circumstances, a trial court may exercise its discretion to refrain from answering a jury's question. *People v. Millsap*, 189 Ill. 2d 155, 161 (2000). Appropriate circumstances would include situations where "the instructions are readily understandable and sufficiently explain the relevant law," "further instructions would serve no useful purpose or would potentially mislead the jury," the jury's question is one of fact not law, or giving an answer would cause the court to "express an opinion that would likely direct the verdict one way or another." *Millsap*, 189 Ill. 2d at 161. Determining the propriety of a trial court's answer to a jury question is a two-step analysis. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 16. First, the trial court's decision on whether to respond to a jury's question is reviewed for an abuse of discretion. *Leach*, 2011 IL App (1st) 090339, ¶ 16. Second, we must determine whether the trial court's response to the jury's question was correct, and our review is *de novo*. *Leach*, 2011 IL App (1st) 090339, ¶ 16.

¶ 30    In this case, the jury asked whether it had to find Mr. Harbin guilty of attempted armed robbery to find him guilty of first degree murder, under a felony murder theory. In other words, the jury asked whether it needed to convict Mr. Harbin of the predicate felony for a first degree felony murder conviction. The answer to that question is clearly yes. Nonetheless, the trial court has discretion with choosing whether to respond to a jury's question. *Leach*, 2011 IL App (1st) 090339, ¶ 16.

¶ 31    Here, the trial court discussed the jury's question with both parties. The defense suggested an explicit answer or referring the jury to Illinois Pattern Jury Instructions-Criminal 7.2X. The court, presumably in order to avoid influencing the jury, did not want to give an explicit answer nor refer the jury directly to one instruction in its packet. Instead, the court directed the jury to reread *all* the jury instructions. The instruction, which answered the jury's question, should then have been obvious. The applicable instruction stated:

> "To sustain the charge of first degree murder, the State must prove that when the defendant performed the acts which caused the death of Miguel Williams, the defendant was attempting to commit the offense of armed robbery. Accordingly, you may find the defendant guilty of first degree murder only if you also find the defendant guilty of attempt armed robbery.
>
> If you find the defendant not guilty of attempt armed robbery, then you must find the defendant not guilty of first degree murder."

The instruction was unambiguous. We cannot say the court's decision to answer the question by directing the jury to reread all of the instructions was an abuse of discretion under the circumstances of this case. See *People v. Averett*, 381 Ill. App. 3d 1001, 1012 (2008) (the trial

court has discretion in determining how best to respond to a jury question). The jury instruction in question here, was readily understandable and explicitly stated, "[i]f you find the defendant not guilty of attempt armed robbery, then you must find the defendant not guilty of first degree murder." No instruction or note given to the jury would have been clearer than that. So, the trial court's direction to reread the instructions was an accurate answer to the jury's question. As such, the trial court did not err in its response to the jury's question.

¶ 32                                Inconsistent Verdicts

¶ 33     Mr. Harbin next argues that the trial court erred in accepting the jury's inconsistent verdicts. Mr. Harbin argues that the guilty verdict on the first degree felony murder count is inconsistent with his acquittal on the predicate felony of attempted armed robbery, and as such, his conviction for first degree felony murder should be vacated.

¶ 34     "[D]efendants in Illinois can no longer challenge convictions on the sole basis that they are legally inconsistent with acquittals on the other charges." *People v. Jones*, 207 Ill. 2d 122, 133-34 (2003). In *Jones*, our supreme court adopted the rule put forward by the United States Supreme Court in *U.S. v. Powell*, 469 U.S. 57 (1984), regarding inconsistent verdicts. In *Powell*, the defendant was charged with the compound offense of using a telephone to commit certain felonies, namely conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute, and the underlying predicate felony counts. *Powell*, 469 U.S. at 59-60. The jury acquitted the defendant of the predicate felony counts while finding her guilty of the compound felonies. *Powell*, 469 U.S. at 60. The defendant appealed her conviction, alleging the verdicts were inconsistent and entitled her to a reversal of the compound felony convictions. *Powell*, 469 U.S. at 60. The United States Supreme Court held that a defendant cannot challenge

a conviction of a compound felony on the sole basis of being acquitted of the predicate felony. *Powell*, 469 U.S. at 68-69. The Court stated that, while it is clear that the jury made a mistake by not following the trial court's instructions that to find the defendant guilty of the compound offense, it had to find her guilty of the predicate offense, it was not clear what caused the mistake. *Powell*, 469 U.S. at 69. The Court reasoned that verdict inconsistency could be a result of a mistake or jury lenity. *Powell*, 469 U.S. at 69. As such, a reversal was not the proper remedy and the defendant's conviction could not be challenged on that ground. *Powell*, 469 U.S. at 69. The Court stated that while a defendant cannot challenge convictions on the basis of inconsistent verdicts, the defendant still has a remedy for jury irrationality or error by the trial or appellate courts' review of the sufficiency of the evidence. *Powell*, 469 U.S. at 67.

¶ 35    Here, the jury convicted Mr. Harbin of first degree felony murder but acquitted him of attempted armed robbery, the felony upon which the first degree felony murder conviction is predicated. While the jury clearly made a mistake, as our supreme court and the United States Supreme Court have stated, we cannot draw inferences from that nor determine the reasoning behind the mistake. As has been well established, Mr. Harbin cannot challenge his conviction on this basis. *Powell*, 469 U.S. at 69. However, he does have the remedy of sufficiency of the evidence, which he also raises on appeal.

¶ 36    Nevertheless, we note that Mr. Harbin's argument is well taken. While ordinarily the simple presence of inconsistent verdicts does not indicate a jury's confusion as to the law, it is arguable that this case is different. The jury, prior to returning its verdict, asked whether it needed to find Mr. Harbin guilty of attempted armed robbery in order to find him guilty of first degree felony murder. While the answer to that question is yes, that result was not borne out in the jury's

verdicts when it acquitted Mr. Harbin of the predicate felony despite his conviction on the first degree felony murder count. That makes it highly likely that the jury's confusion led to the result before us. However, this court is bound by the precedent set by our supreme court and there are no exceptions to the rule about inconsistent verdicts, even in situations such as the case before us. If an exception is to be made for rare circumstances such as this, it is best left to our supreme court to adopt one, as it adopted the inconsistent verdict rule in 2003 in *Jones*, 207 Ill. 2d 122.

¶ 37                              Sufficiency of the Evidence

¶ 38    Mr. Harbin argues that the evidence at trial was insufficient to convict him of first degree felony murder. He claims the State did not elicit sufficient evidence to convict him of attempted armed robbery and, therefore, he could not be convicted of the compound offense of first degree felony murder.

¶ 39    When reviewing a challenge to the sufficiency of the evidence, "the question is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for resolving conflicts in the testimony, weighing the evidence, and drawing reasonable inferences from the facts presented at trial. *McLaurin*, 2020 IL 124563, ¶ 22. "In reviewing the evidence, this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact." *McLaurin*, 2020 IL 124563, ¶ 22. A defendant's conviction will be reversed only when the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of his guilt. *People v. Newton*, 2018 IL 122958, ¶ 24.

¶ 40    Section 9-1(a)(3) of the Criminal Code of 2012 states that first degree murder, under a felony murder theory, is committed when a person "commits or attempts to commit a forcible felony other than second degree murder, and in the course of or in furtherance of such crime or flight therefrom, he or she or another participant causes the death of a person." 720 ILCS 5/9-1(a)(3) (West 2016). In this case, the State attempted to prove that, during the commission of an attempted armed robbery for car wheel rims by Mr. Harbin, Miguel Williams was killed. Specifically, the State's theory was that Mr. Harbin attempted to rob Mr. Jackson at gunpoint, causing Miguel Williams to start shooting to prevent the robbery. As Mr. Harbin attempted to flee, he shot at the SUV's backseat, resulting in Miguel Williams' death. Mr. Harbin and Mr. Jackson's testimony regarding the details of the incident are mostly consistent, only differing on what motivated the initial shooting from the backseat. Mr. Jackson said Mr. Harbin attempted to take his $10,000 wheel rims by sticking a gun in his face, which caused Miguel Williams to shoot at Mr. Harbin. On the other hand, Mr. Harbin stated that he approached the SUV after being called over and, unprovoked, Miguel Williams started shooting at him. Evidently, the jury believed the testimony of Mr. Jackson over Mr. Harbin, and while a different trier fact may have reached another conclusion, we cannot disturb that determination. It is, after all, the responsibility of the trier of fact to resolve conflicts in the testimony. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009).

¶ 41    Further, the testimony of Mr. Jackson, who stated that Mr. Harbin tried to rob him and then shot into the backseat where Miguel Williams was sitting, was enough to convict Mr. Harbin of first degree felony murder. See *People v. Smith*, 185 Ill. 2d 532, 541 ("The testimony of a single witness, if it is positive and the witness credible, is sufficient to convict."). As such, we find the

evidence presented at trial was sufficient to sustain Mr. Harbin's conviction and we affirm his conviction for first degree felony murder.

¶ 42                                    Double Jeopardy

¶ 43    Mr. Harbin also argues that his conviction for first degree felony murder violated his right against double jeopardy. He contends that his acquittal on the predicate felony of attempted armed robbery estopped the jury from convicting him of the first degree felony murder count.

¶ 44    The double jeopardy clause of the Illinois Constitution "protects an accused from twice being placed in jeopardy for the same offense." *People v. Milka*, 211 Ill. 2d 150, 169 (2004) (citing Ill. Const.1970, art. I, § 10). "The Double Jeopardy Clause, applied to the States through the Fourteenth Amendment, provides that no person may be tried more than once 'for the same offence.' " *Currier v. Virginia*, 138 S. Ct. 2144, 2149 (2018).

¶ 45    In support, Mr. Harbin cites *People v. Milka*, 211 Ill. 2d 150 (2004), for his contention that his conviction for first degree murder violated his right against double jeopardy. In *Milka*, 211 Ill. 2d at 174, our supreme court, quoting Maryland's highest court in *Bynum v. State of Maryland*, 277 Md. 703, stated, " '[d]ouble jeopardy is not suffered unless a man is twice put on trial.' " *Milka*, 211 Ill. 2d at 174 (quoting *Bynum v. State of Maryland*, 277 Md. at 707). As a result, along with other reasons, the defendant in *Milka* could not succeed with his argument that his constitutional right against double jeopardy was violated when he did not stand trial twice.

¶ 46    Just like the defendant in *Milka*, Mr. Harbin was not put on trial for a second time, and consequently, he cannot raise an argument that his right against double jeopardy was implicated because the jury acquitted him of the predicate felony but convicted him of first degree felony murder in the same trial.

¶ 47                              Due Process

¶ 48    Lastly, Mr. Harbin argues that his due process rights were violated because he was not allowed to introduce evidence that Miguel Williams regularly carried a firearm on his person. He alleges that the State foreclosed that option, due to the *nolle prosequi* of the knowing and intentional first degree murder counts, after his motion to present self-defense evidence was granted. While there is clearly a cleverly surmised analysis underpinning this theory, Mr. Harbin does not cite any case law or authority to support his due process argument.

¶ 49    "Contentions supported by some argument, but no authority do not meet the requirements of Supreme Court Rule 341(h)(7)" and, as such, are forfeited. *People v. Macias*, 2015 IL App (1st) 132039, ¶ 99. Moreover, the appellate court is not a repository in which the appellant " 'may dump the burden of argument and research.' " *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 682 (1993)). We, as a reviewing court, are entitled to arguments that are clearly defined and supported by pertinent authority. *Lindsey*, 397 Ill. App. 3d at 459. Arguments cannot be based on intuition and supposition. Therefore, Mr. Harbin's due process argument is forfeited.

¶ 50    Assuming *arguendo* we were to consider this argument and Mr. Harbin was allowed to present evidence to the jury that Miguel Williams regularly kept a firearm on his person, we do not see how this testimony would have resulted in a different outcome. The accounts from both the State's and Mr. Harbin's witnesses placed a firearm in the hands of Miguel Williams and blamed him for the first shots. Thus, clearly, on the night in question, Miguel Williams was carrying a firearm. It was also clear from the evidence that Miguel Williams was carrying firearm ammunition at the time of his death. So, it is unclear how more evidence proving that he carried a

firearm at other times would have been probative of anything that happened at the time of the shooting that evening. Moreover, Mr. Harbin presented evidence that he and Miguel Williams dated the same woman and that Miguel Williams made threats against Mr. Harbin. The jury simply believed the State's account of events. Knowledge about Miguel Williams carrying a firearm previously would have had no effect on that. Thus, without a meaningful error by the trial court, we cannot say Mr. Harbin's due process rights were violated by his conviction.

¶ 51    Accordingly, we affirm Mr. Harbin's conviction for first degree felony murder.

¶ 52                                    CONCLUSION

¶ 53    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 54    Affirmed.