2022 IL App (2d) 210496-U
No. 2-21-0496
Order filed September 26, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 19-CM-306 |
| BRIAN J. SICILIA, | ) ) ) | Honorable Philip G. Montgomery, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's conviction of sexual exploitation of a child was affirmed where the evidence established beyond a reasonable doubt that defendant, who was lying in bed close to the victim, masturbated with knowledge that the victim would see the act.

¶ 2    Following a bench trial in the circuit court of Kendall County, defendant, Brian J. Sicilia, was found guilty of battery (720 ILCS 5/12-3(a)(2) (West 2018)) and sexual exploitation of a child (720 ILCS 5/11-9.1(a)(1) (West 2018)).  On appeal, he argues that the evidence was insufficient to support his conviction of sexual exploitation of a child.  We affirm.

¶ 3                                  I. BACKGROUND

¶ 4    The State charged defendant with battery, sexual exploitation of a child, and attempted aggravated criminal sexual abuse (720 ILCS 5/8-4(a), 11-1.60 (West 2018)).  The charges were based on defendant's conduct involving a 14-year-old female, B.I.

¶ 5    The following facts were established at defendant's bench trial.  Defendant lived in Yorkville with his wife, two daughters, L.S. and E.S., and son, D.S.  Defendant coached D.S.'s baseball team.  B.I.'s brother also played for the team.

¶ 6    On June 19, 2019, the baseball team had a game scheduled.  Because defendant's wife was out of town and the weather was rainy, B.I. was babysitting L.S. and E.S. at her house.  After the game ended, defendant and several members of the team and their families gathered at a local restaurant.  B.I.'s mother brought her, E.S., and L.S. to the restaurant.  While at the restaurant, L.S.'s face was swollen because of an allergic reaction.  Because L.S. felt uncomfortable about how she looked, someone mentioned that she could put on makeup.  Defendant then commented, to make L.S. feel better, that she did not need makeup because she was already pretty.  B.I.'s mother then commented that B.I. wore makeup.  Defendant responded that B.I. was pretty and did not need makeup.  At one point, E.S. and L.S. approached defendant and asked if B.I. could have a sleepover at their house.  Defendant and B.I.'s mother approved.  D.S. asked if B.I.'s brother could stay over, but his mother would not allow it.

¶ 7    Defendant left the restaurant with E.S., L.S., D.S., and B.I.'s brother, who was going to play with D.S. for a while at home.  B.I.'s mother took B.I. home so that B.I. could pick up an overnight bag.  She then dropped off B.I. at defendant's house, picked up her son, and left.

¶ 8    After the girls arrived, they played for a short while in a playroom.  Following that, they went to a family room in the basement.  The three girls began playing pool.

¶ 9    Witness accounts varied as to defendant's conduct toward B.I. at the home. L.S., who was seven years old on the date of the incident, testified that B.I. was not good at pool, so defendant showed her how to play. L.S. described defendant as standing in front of B.I. and only touching B.I.'s hands. While the girls played pool and Jenga, defendant sat at a nearby bar and watched television. Although L.S. could not recall at trial whether D.S. was in the basement, she admitted that she told an investigator that D.S. was not in the basement because he was sleeping.

¶ 10    After playing games in the basement, the three girls wanted to watch a movie. Defendant decided to have them watch the movie in the master bedroom because the bed was big enough for the three of them. According to L.S., E.S. was on her mother's side of the bed, L.S. was in the middle, and B.I. was on defendant's side. Defendant sat on the bed next to B.I. and put on the movie. According to L.S., before she fell asleep, she saw defendant leave the bedroom. However, she admitted that she never told the investigator that she saw defendant leave.

¶ 11    On cross-examination, L.S. denied ever seeing defendant hug B.I., play with her hair, tickle her, or play with the hood on her sweatshirt. She did not recall seeing defendant push his body against B.I. when he showed her how to play pool. According to L.S., it was she and E.S. who asked defendant to show B.I. how to play pool. When defendant sat on the bed, he was on top of the covers, while the three girls were under the covers.

¶ 12    E.S., who was nine years old on the date of the incident, testified that she met B.I. because their brothers played on the same baseball team. After leaving the restaurant, she, L.S., D.S., and defendant went home. Later that evening, B.I.'s mother dropped her off at the house for a sleepover. E.S. admitted telling an investigator that it was defendant's idea for a sleepover because he wanted B.I. to babysit the girls the next morning.

¶ 13    The three girls played in a playroom for a while, then went to the basement to play pool. According to E.S., because B.I. was not good at pool, defendant showed her how to play. In doing so, he stood behind B.I. The three girls also played Jenga while defendant sat at the bar and watched television.

¶ 14    After playing in the basement, the three girls went to E.S.'s parents' bedroom to watch a movie because the television was bigger. The girls got under the covers, and defendant sat on top of the covers. E.S. was on her mother's side, L.S. was in the middle, and B.I. was on defendant's side. Defendant sat next to B.I. E.S. did not watch the whole movie because she fell asleep. She admitted telling the investigator that she fell asleep before defendant left the room. When E.S. awoke the next morning, only she and L.S. were in the bed, and defendant was in the bathroom brushing his teeth.

¶ 15    On cross-examination, E.S. testified that she had asked defendant to show B.I. how to play pool. She denied that defendant touched his body against B.I. while showing her how to play pool. E.S. never saw defendant touching B.I. or she would have remembered it. She denied seeing defendant play with B.I.'s hair or hood or hug B.I. She denied hearing defendant ask B.I. if she was a light sleeper or if she wanted to be the family's nanny. E.S. denied that defendant ever asked the girls to switch positions while playing Jenga. According to E.S., D.S. was in the basement most of the time. He and defendant sat at the bar watching television.

¶ 16    While brushing her teeth before bed, E.S. never heard defendant tell B.I. that B.I. was too pretty to brush her teeth. E.S. never saw defendant touch B.I. while they were in bed. Defendant sat on top of the covers and never laid down. In the morning, defendant told E.S. that B.I. had gone home early because she was not feeling well. E.S. denied lying to the investigator; she explained that some of what she told the investigator was inaccurate because she was confused.

¶ 17    B.I., who was 14 years old on the date of the incident, testified that she had met E.S. and L.S. because her brother played on the same baseball team as their brother. On the date of the incident, E.S. and L.S. were at B.I.'s house because it was rainy and they did not want to go to their brother's baseball game.

¶ 18    At one point, B.I.'s mother picked up the three girls and they went to a local restaurant. Defendant was there, along with some players and their family members. Defendant's wife was not there. Defendant told B.I. at one point that she was "too pretty to wear makeup."

¶ 19    After leaving the restaurant, B.I. went to her house and then to defendant's house for a sleepover. After arriving at defendant's house, B.I. and the two girls played in the playroom. Afterward, they went to the basement to play.

¶ 20    The three girls initially played pool. Defendant sat at the bar. At one point, defendant approached B.I. and showed her how to play pool. When he did so, he touched B.I. with his arm around her shoulders and down her arm. He stood behind her, and his hands were on the pool cue. That made B.I. a "little bit uncomfortable."

¶ 21    After playing pool, the three girls played Jenga near the bar. As defendant sat at the bar, L.S. was closest to him. At one point, defendant asked B.I. and L.S. to change places so that he could see L.S.'s face. After doing so, B.I. was now sitting closest to defendant with her back to him. As she sat there, he began touching her hair. He also raised B.I.'s hood, but she put it down. Defendant did not touch her again while she was sitting.

¶ 22    When B.I. stood up, defendant gave her a "side hug," with one arm around her. One time he touched her back over her clothes and another time he touched her back under her sweatshirt. She had no shirt under her sweatshirt. When defendant touched her back, he rubbed it up and down with his open palm. Defendant also tickled B.I. and told her that she was too skinny.

¶ 23    At one point, defendant joked about B.I. moving with his family to Indiana to be their nanny. When he asked her how old she was, she said she was 14.

¶ 24    As they played Jenga, defendant asked the three girls to pose for a photo. When B.I. told him that he could send the photo to her mother, defendant offered to send it to B.I. if she would give him her phone number. She did so. Defendant then sent her the photo right away.

¶ 25    While still in the basement, defendant asked the three girls if they wanted to go in the hot tub, but they declined because they were too tired. Defendant also asked B.I. if she was a heavy sleeper, and she said not really. Several times, defendant asked B.I. to come to him, gave her a side hug, and thanked her for being with his girls. Defendant asked her who did her hair, and she told him that it was highlighted.

¶ 26    According to B.I., no one but she, E.S., L.S., and defendant were in the basement. They remained there until around midnight.

¶ 27    After leaving the basement, B.I., E.S., and L.S. went to the parents' bedroom. Although E.S. and L.S. brushed their teeth, B.I. did not because she had done so before she left her house. When E.S. and L.S. asked B.I. if she was going to brush her teeth, defendant answered that B.I. was "too pretty to brush [her] teeth." According to B.I., both E.S. and L.S. were present when defendant said that. D.S. was not in the bedroom that night.

¶ 28    According to B.I., when they went into the bedroom, she asked the girls if they wanted her to sleep in the middle. L.S. responded that defendant wanted B.I. to sleep on his side of the bed. When the three girls got into bed, E.S. was on her mother's side, L.S. was in the middle, and B.I. was on defendant's side. They were lying under a blanket.

¶ 29    After they were under the covers, defendant came in and sat next to B.I. B.I. moved over some. Defendant sat near the headboard and right next to B.I. Defendant said he was going to help them pick a movie. According to B.I., no one else was in the room the entire time.

¶ 30    B. I. wore to bed the same clothes that she wore to the house: leggings and a sweatshirt. Because defendant made her uncomfortable, B.I. laid on her back to avoid either facing defendant or having her back to him.

¶ 31    At one point, while the movie was on, defendant got under the covers and lay on his back. B.I. was unable to pay attention to the movie because defendant was frightening her. While under the covers, defendant kept moving closer to B.I. and touching her. At one point, he was playing with her feet with his feet. He also touched B.I. under her thighs.

¶ 32    After defendant turned off the movie because E.S. and L.S. were tired, defendant began touching B.I.'s arm between her elbow and her shoulder and also her stomach over top of her sweatshirt. When defendant touched her stomach, she would move his hand off and he would put it back. At one point, defendant told her that she was probably warm in her clothes and offered her a pair of his shorts and a T-shirt. She declined. Later, he brought her a pair of his shorts and a T-shirt to wear, but she again declined.

¶ 33    According to B.I., she was "stiff" with fear and tried to inch closer to L.S. There was very little room for her to move away from defendant.

¶ 34    At one point, defendant stopped touching her. When she went to sleep, defendant was facing away from her. When she woke up later, the room was dark. She believed she woke up because defendant was "close enough to touch [her]." He was no longer facing away from her. She was "pretty sure" that he was now touching either her arm or her stomach. Also, although he was under the covers when she fell asleep, he was now on top of the covers. She could see him

touching his genitals with his hands. She saw him move his hand up and down. When asked if she heard anything while defendant was touching his genitals, she answered that she heard him stand and pull up his pants. Right after that, defendant reached across B.I., picked up L.S., and put her where B.I. was. B.I. moved to where L.S. had been.

¶ 35    At one point, after B.I. returned to bed from the bathroom, defendant asked her if he was being "weird" and making her feel uncomfortable. He also asked if she wanted him to leave, but he also added that he was tired and comfortable. Because B.I. was afraid, she answered that it was fine and did not tell him that he was making her uncomfortable.

¶ 36    While in bed, after defendant had touched her, B.I. began texting her mother. She first texted her mother while it was dark. At the time, she was confused and afraid. She told her mother that she wanted to be picked up early because defendant had planned for them to go to the pool and she did not want to go. B.I. testified that she did not want to go swimming because she would not feel comfortable in a swimsuit around defendant.

¶ 37    B.I. then identified several texts between her and her mother. She testified that she sent them because she was uncomfortable and afraid and wanted to leave. She sent some of the texts from the bathroom and others after defendant had repositioned her and L.S. in the bed.

¶ 38    At 12:53 a.m., B.I. texted asking her mother to pick her up early. Her mother did not respond because she was sleeping. B.I. texted again at 2:26 a.m., asking her mother to pick her up early but not to tell defendant that she had been texting. B.I. texted her mother once again at 4:55 a.m. and asked her to pick her up. Her mother responded and asked what was wrong. B.I. answered that defendant was "creepy" and "weird," slept right next to her, and would not stop touching her. B.I. again asked her mother to pick her up early but not to tell defendant she was doing so. Her mother asked her if defendant was still sleeping next to her and if she could get out

of bed without waking anyone. Her mother also texted that she did not like how defendant was touching her. After her mother said that she would pick her up, B.I. asked what she should say to defendant if he was awake. Her mother told her to tell him that she was sick. Once her mother arrived, she texted B.I. and told her that she would text defendant that B.I. was sick. B.I. left the bed, grabbed her overnight bag, and went downstairs. In doing so, she knocked over an interior dog fence. As she went out the front door, she activated the security alarm. She quickly exited the house and left with her mother.

¶ 39    On cross-examination, B.I. admitted that L.S., not defendant, proposed the sleepover. She also admitted that, when defendant showed her how to play pool, he did not push his stomach or pelvis against her nor was he rubbing or grinding. She reiterated that D.S. was neither in the basement nor, later, in his parents' bedroom.

¶ 40    B.I. admitted that some of the texts to her mother did not mention that defendant had touched her. B.I. explained that she was uncomfortable talking about it.

¶ 41    B.I. stated that, though the bedroom was dark once the television was off, her eyes adjusted. She admitted that defendant never touched her breasts, her rear end, or between her thighs. She admitted that she told the investigator that she was " 'pretty sure' " she saw defendant " 'doing something to himself' " that she thought was known as " 'jerking off.' " She told the investigator that she was not sure exactly what "jerking off" was. B.I. also told the investigator that she " 'just looked really quickly' " and that she was " 'not sure for sure because *** [she] couldn't really see in the dark.' " She told the investigator, " ' I just saw, I guess, kind of barely.' " When the investigator asked what she saw, B.I. told her, " 'Really not much, just like a shadow *** because it was dark and it was really quickly, too. I turned back.' "

¶ 42    B.I. acknowledged that she seemed uncertain in speaking with the investigator, but she attributed this to her discomfort with discussing the subject matter in that setting.  When the investigator asked her if she saw defendant's penis, B.I. answered, " 'I don't know how to explain it.  It was super late and I was super tired.' "  B.I. told the investigator that she saw defendant out of " 'the corner of [her] eye' " and did not turn her head towards him.  Thus, she did not observe any details.  When the investigator asked B.I. again if she saw the shape of defendant's penis, she answered, " 'I think.' "  When the investigator asked her if she saw defendant touching his penis, B.I. answered, " 'I think that's what I saw.  I am not saying I am sure because I'm not.  I was pretty sure.' "

¶ 43    B.I. testified that she and her mother exchanged further text messages after her mother picked her up from defendant's home.  B.I. acknowledged that her mother asked B.I. " 'if something more happened' " and B.I. replied, " 'OMG I swear it didn't, mom.  I wouldn't lie to you.' "  B.I. admitted that none of her text messages to her mother mentioned "jerking off" or masturbation.

¶ 44    On redirect, B.I. reasserted that she was uncomfortable talking to the investigator about a man's penis.  According to B.I., when she saw defendant's penis out of the corner of her eye, she did not want to keep looking.

¶ 45    Defendant's son, D.S., testified for the defense.  On June 19, 2019, defendant drove D.S., E.S., L.S., and B.I.'s brother home from the restaurant.  The plan was for B.I.'s mother to drop her off later for a sleepover.  B.I.'s brother left with his mother after she dropped off B.I.

¶ 46    After B.I. arrived, she, E.S., and L.S. played in the basement near the pool table. Defendant and D.S. sat at the bar watching television.  According to D.S., he would walk in and out but most of the time he was in the basement.  Later that evening, D.S. went upstairs to sleep.  D.S. denied

seeing defendant touch B.I. while in the basement. He was certain he would have remembered something like that.

¶ 47   D.S. went upstairs a few minutes before the others. As he brushed his teeth and got ready for bed, he heard the others talking. He never heard defendant tell B.I. that she was too pretty to brush her teeth.

¶ 48   According to D.S., the plan was that the girls would sleep in the parents' bedroom and defendant would sleep with D.S. in his room. After waiting for defendant, D.S. went into his parents' bedroom and sat in a rocking chair. The room was dark but the television was on. Later, D.S. and defendant went to D.S.'s room and went to sleep. According to D.S., defendant stayed in D.S.'s bed and D.S. never saw him leave. When D.S. awoke in the morning, defendant was still in his bed. D.S. denied ever seeing defendant touch B.I., play with her hair, or tickle her. According to D.S., he definitely would have noticed defendant acting like that. He also never saw defendant call B.I. over to him while in the basement.

¶ 49   On cross-examination, D.S. could not recall what movie played while he was in his parents' bedroom. Nor could he remember what defendant or B.I. was wearing. He also had difficulty remembering what he told the investigator, even though he had reviewed the video-recorded interview. Moreover, though D.S. stated that the rocking chair was only a couple of feet from the bed, D.S. could not recall how the girls were positioned on the bed. D.S. admitted that he loved defendant and did not want to see anything bad happen to him. On redirect, he denied lying to protect defendant.

¶ 50   Jeff Ceres knew defendant because their sons played baseball together. He was at the restaurant and did not recall any discussions about makeup. According to Ceres, defendant's daughters brought up the idea of a sleepover.

¶ 51    Defendant's wife, Erica, testified that, sometime after the incident, defendant was staying at a hotel and had a Facetime call with their children. During the call, Erica did not hear defendant tell the children what to say to investigators.

¶ 52    Defendant testified that, on June 19, 2019, there was a baseball game scheduled. Because the weather was rainy, he arranged to have B.I., whose brother played on the team that defendant coached, babysit E.S. and L.S. Defendant's wife was in Indiana for the week for work training. Defendant dropped E.S. and L.S. off at B.I.'s house and went to the game.

¶ 53    After the game was rained out, defendant went to a local restaurant with D.S. and other players. B.I.'s mother brought B.I., E.S., and L.S. to the restaurant. When they arrived, defendant noticed that L.S. was having an allergic reaction. Someone mentioned that L.S. should use makeup to make her look better. To make L.S. feel better, defendant said that she was pretty enough without makeup. When B.I.'s mother said that B.I. wore makeup, defendant said "something to [B.I.] about her not having to wear makeup" because she was pretty without it. Defendant admitted that he had a couple of beers at the restaurant.

¶ 54    At one point, E.S. and L.S. approached defendant's table and asked if they could have a sleepover at their home. Defendant and B.I.'s mother agreed that they could. The idea appealed to defendant because had to work the next day and his wife was out of town—he thought that B.I. could babysit the girls and take them to the swimming pool. According to defendant, he also asked if B.I.'s brother could stay over but his mother would not allow him. However, he was allowed to go to their house for a while to play with D.S. Later, after defendant, E.S., L.S., D.S., and B.I.'s brother arrived at the house, B.I.'s mother dropped her off at the house and picked up her brother.

¶ 55    The three girls went to the basement to play. D.S. was in the basement setting up the television so that he and defendant could watch sports. According to defendant, he and D.S. sat at the bar watching television.

¶ 56    At some point, the girls were playing pool. Defendant sent B.I.'s mother a photo of the girls playing pool. Her mother responded that B.I. was not very coordinated and might rip the tabletop. E.S. then asked defendant to teach B.I. how to shoot pool. According to defendant, he first demonstrated how to hold a pool cue. He then handed the cue to B.I. and "just kinda touched her hand to show her how." Defendant only touched B.I.'s hand that one time.

¶ 57    Later, the girls started playing Jenga. Defendant was still sitting at the bar with D.S. Defendant took a photo of the girls holding a Jenga block. Defendant admitted that he texted the photo to B.I. He could not recall if he asked her for her phone number or already had it because of babysitting.

¶ 58    Defendant denied ever asking the girls to switch places while playing Jenga. He also denied playing with B.I.'s hair, hood, or sweatshirt at any time during the evening. He made no physical contact with B.I. other touching her hand one time while showing her how to play pool. He denied ever hugging her, tickling her, or rubbing her back.

¶ 59    At some point, D.S. said he was tired and left the basement to go to bed. The girls were still playing, but, because of the late hour, defendant told them to clean up because it was time for bed. The plan was to have the three girls sleep in the master bedroom because it had a king bed that would hold them. D.S. wanted defendant to sleep with him in D.S.'s room.

¶ 60    Before going to bed, the girls brushed their teeth in the hall bathroom. Defendant brushed his teeth in the master bathroom. He denied telling B.I. that she was too pretty to brush her teeth.

When defendant finished brushing his teeth, the girls were already in bed. D.S. was sitting in a rocking chair in the corner of the master bedroom, waiting for defendant.

¶ 61    Because the girls could not decide on a movie, defendant sat on the bed next to B.I. and took the remote control. He selected "Annie" as the movie. The room was dark apart from the television. According to defendant, he sat on top of the covers. He was wearing athletic shorts and a T-shirt.

¶ 62    B.I. wore a sweatshirt and leggings and did not bring a change of clothes. Because B.I. was in bed with street clothes on and the bedroom was warm, defendant—to be polite—offered her shorts and a T-shirt. B.I. said no thank you, and defendant did not ask her again.

¶ 63    Defendant initially sat on the bed and watched some of the movie to make sure that it was an appropriate version for the girls. At one point after midnight, defendant had dozed off and D.S. tapped him on the knee and said they should go to D.S.'s room. The blinds were closed and there was no ambient light in the room.

¶ 64    As defendant went to turn off the television and go to D.S.'s room, he noticed that L.S. was in an awkward position in the bed. He lifted her and placed her where he had been sitting on the bed. He then turned off the television and went to D.S.'s room. Defendant did not return to the master bedroom until the security alarm went off the next morning.

¶ 65    When the alarm went off, defendant was sleeping in D.S.'s room. After checking on D.S., defendant went into the master bedroom to check on the girls. E.S., L.S., and the dog were in the bed but B.I. was not. Because E.S. and L.S. were still sleeping, defendant deactivated the alarm and went downstairs to see if B.I. was there. Defendant saw that the deadbolt on the front door was unlocked.

¶ 66    When defendant went back upstairs, he saw that he had a text from B.I.'s mother. She explained that she had picked B.I. up early because B.I. did not feel well, and she apologized for B.I. setting off the alarm. Defendant locked the house, activated the alarm, and went to bed with his daughters. Later that morning, defendant texted B.I.'s mother, then texted B.I. to see how she was feeling. He did so because he was worried that E.S. or L.S. might get sick.

¶ 67    The next day, as defendant was driving home from work, he received several texts from an individual whom he thought was B.I. but who was really a detective. Defendant responded to the texts by denying that he had done anything wrong. He denied ever telling his children what to say to the investigators.

¶ 68    On cross-examination, defendant reiterated that he never touched B.I. other than on her hand when he showed her how to play pool. He admitted to offering B.I. some of his clothes to sleep in. He also admitted that there was a hot tub at the house but said there was no water in it on the date of the incident.

¶ 69    After the close of evidence, the court issued its ruling. In doing so, it reviewed all the evidence, including all the texts between B.I. and her mother. The court found that B.I. had testified truthfully and believed her as to what happened that night. The court saw no evidence to suggest why B.I. would have fabricated her story. The court noted that B.I.'s text messages to her mother corroborated her testimony. The court found defendant guilty of battery and sexual exploitation of a child. As to the latter offense, the court found that, because defendant was lying right next to B.I. with the covers off and his penis exposed while he masturbated, he intended for B.I. to view his acts. Another reason the court found B.I. credible was that "she did not exaggerate what occurred that night." She could have claimed that defendant touched or tried to touch her

sex organs, but she did not. Thus, the court found defendant not guilty of attempted aggravated criminal sexual abuse.

¶ 70    Defendant filed a motion for a new trial, which he later amended. In denying the motion, the trial court reviewed the trial transcript and reiterated that B.I. was credible and that it believed her. The court commented that it had found defendant's testimony to be nonresponsive and evasive. The court concluded, "I did not believe [defendant's] testimony, and I cannot say it more strongly than that."

¶ 71    Following the denial of defendant's motion for a new trial, the court sentenced defendant to 24 months' probation. Defendant, in turn, filed a timely notice of appeal.

¶ 72                                    II. ANALYSIS

¶ 73    On appeal, defendant contends that (1) the State did not prove beyond a reasonable doubt that he masturbated on his bed as he lay next to B.I. and (2) even if the State proved he masturbated, it did not prove beyond a reasonable doubt that he did so with knowledge that B.I. would see him in the act.

¶ 74    Due process requires the State to prove each element of a criminal offense beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). In addressing a challenge to the sufficiency of the evidence, the reviewing court does not retry the defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Rather, the question on appeal is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 278. This standard requires the reviewing court to draw all reasonable inferences in favor of the prosecution. *Cunningham*, 212 Ill. 2d at 280. Resolving discrepancies and inconsistencies in the evidence is the fact finder's province. *Cunningham*, 212 Ill. 2d at 283. A reviewing court will not

overturn a guilty verdict unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of defendant's guilt. *People v. Collins*, 214 Ill. 2d 206, 217 (2005).

¶ 75 The positive and credible testimony of a single witness is sufficient to support a criminal conviction. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). A reviewing court must duly consider that a trial court can see and hear the witnesses. *People v. Ortiz*, 196 Ill. 2d 236, 267 (2001). A fact finder's determination of a witness's credibility is entitled to great deference but is not conclusive. *Cunningham*, 212 Ill. 2d at 279. Where a conviction depends on eyewitness testimony, the reviewing court may find testimony insufficient only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt. *Cunningham*, 212 Ill. 2d at 279. A reviewing court will reverse a conviction based on incredible eyewitness testimony only where that testimony is improbable, unconvincing, or contrary to human experience. *Ortiz*, 196 Ill. 2d at 267.

¶ 76 Sexual exploitation of a child occurs when a person, in the presence of a child, and with the knowledge that the child would view his or her act, engages in a sexual act. 720 ILCS 5/11-9.1(a)(2) (West 2018). Section 11-9.1(b) of the Criminal Code of 1963 (Code) (720 ILCS 5/11-9.1(b) (West 2018)) defines "sexual act" to include masturbation. Although the Code does not define "masturbation," it is commonly understood to mean an erotic stimulation involving the genital organs commonly resulting in orgasm and achieved by manual or other bodily contact exclusive of sexual intercourse. *People v. Ricky T.*, 405 Ill. App. 3d 98, 100 (2010).

¶ 77 We turn first to whether the State proved beyond a reasonable doubt that defendant masturbated while he was lying in bed next to B.I. It did.

¶ 78 The State offered only B.I.'s testimony to prove that defendant masturbated. The trial court expressly found her testimony credible and believable. Thus, the only way defendant can prevail

on appeal is to show either that (1) B.I.'s account of what she saw was improbable, unconvincing, or contrary to human experience, or (2) what B.I. saw did not constitute masturbation within the meaning of section 11-9.1(b) of the Code. Defendant has shown neither.

¶ 79 We cannot say that B.I.'s testimony was improbable, unconvincing, or contrary to human experience. B.I. provided detailed testimony about defendant's conduct on the day and evening of the incident. She attested to his comment at the restaurant that she was "too pretty to wear makeup." Defendant admitted making essentially the same comment. B.I. also testified in detail how defendant touched her numerous times while she and defendant's daughters played in the basement. Certainly, other witnesses, including defendant's son, D.S., testified that they did not see defendant touch B.I. However, B.I. testified that D.S. was not in the basement that night. L.S. testified that she could not recall if D.S. was in the basement, but she admitted that she told an investigator that he was not in the basement.

¶ 80 B.I. also testified that defendant said she was "too pretty to brush [her] teeth." Further, she detailed the events that occurred in the bedroom. She testified how defendant got under the covers next to her in bed and played with her feet with his feet, repeatedly touched her arm and stomach despite her moving his hand away several times, and put his hands between her thighs and the mattress. She also described waking up and feeling him lying next to her on top of the covers. She explained that, although it was dark in the room, she could see his hands on his genitals, and one of the hands was moving up and down.

¶ 81 B.I. added that defendant's conduct made her extremely uncomfortable. She was "stiff" with fear and tried to inch closer to L.S. Just after midnight, she began texting her mother, asking her to pick her up early. Those text messages corroborate much of B.I.'s testimony. Although B.I.'s texts do not mention defendant touching his genitals, she explained that she did not feel

comfortable talking about such things with her mother. B.I. persisted in texting her mother throughout the night until she received a response. Her texts expressed fear of defendant and her desire to get out of the house. The texts were essentially consistent with her trial testimony.

¶ 82 B.I.'s testimony was further bolstered by her interview with the investigator, in which she gave a consistent account of the evening's events. She told the investigator that she saw defendant touch his genitals. She used the expression "jerking off." When the investigator asked her if she saw the shape of defendant's penis and defendant touching it, she said that she thought so and that she was " 'pretty sure' "—it was dark and she had looked quickly. B.I. explained in court that, although she was now certain of what she saw, she was tentative with the investigator because she was uncomfortable discussing the subject matter in that setting. In our view, B.I.'s reluctance to discuss defendant's sexual conduct was understandable given that she was a 14-year-old girl asked to discuss with an unfamiliar person an obviously sensitive and uncomfortable situation.

¶ 83 To show that B.I. was not credible, defendant points to his denials (1) that he touched B.I. except on her hand as he showed her how to play pool, (2) that he got under the covers and laid next to B.I., or (3) that he touched his genitals while lying next to her. However, the trial court expressly found that defendant was not credible. We agree with the court that many of defendant's answers at trial were evasive and non-responsive. Accordingly, we find no reason to reject the court's credibility assessment of defendant.

¶ 84 Notably, the trial court found B.I. credible partly because "she did not exaggerate what occurred that night." We agree. B.I. did not allege to the investigator that defendant touched any of her sex organs. She admitted at trial that defendant never touched her breasts, her rear end, or between her thighs. Indeed, because of those admissions, the trial court found defendant not guilty of attempted aggravated criminal sexual abuse. Yet, B.I. was not reluctant to testify that she saw

defendant touching his genitals and moving his hand up and down. For this reason, her testimony was particularly believable.

¶ 85    Having carefully reviewed B.I.'s testimony and the other evidence, we conclude that her testimony was neither improbable, unconvincing, nor contrary to human experience. Thus, we accept the trial court's finding that B.I. was a credible witness.

¶ 86    Defendant also asserts that, because it was dark in the bedroom, B.I. was unable to accurately observe his conduct while he was lying next to her. We disagree.

¶ 87    Positive identification by a single witness who had ample opportunity to observe is sufficient to support a conviction. *People v. Chevalier*, 159 Ill. App. 3d 341, 346 (1987). Here, B.I. had an adequate chance to observe defendant's conduct. He was lying right next to her in the bed. He was also uncovered. Although it was dark in the room, B.I.'s eyes had adjusted. Because of defendant's close proximity, and despite the darkness in the room, B.I. had the ability to see defendant touching his genitals and moving his hand up and down. Thus, we disagree with defendant that B.I. was unable to observe defendant's actions as he lay next to her in the bed.

¶ 88    Having reviewed the evidence in the light most favorable to the State, we find no basis to reject the trial court's finding that B.I. was credible. Thus, we conclude that the State proved beyond a reasonable doubt that defendant masturbated while lying next to B.I. in bed.[1]

---

[1]We note that defendant does not dispute that his actions, as described by B.I., constituted masturbation. Even if he did, we would disagree. The act of a man touching his genitals and moving his hand up and down, while lying in bed next to a 14-year-old girl that he had repeatedly touched inappropriately throughout the evening, clearly constituted masturbation. See *Ricky T.*, 405 Ill. App. 3d at 100.

¶ 89    We turn next to the issue of whether the State proved beyond a reasonable doubt that defendant masturbated with the knowledge that B.I. would view him.  It did.

¶ 90    It is hard to imagine that defendant, who was uncovered and lying in bed right next to B.I., would not expect B.I. to see him masturbating.  After he had kept her awake for some time by repeatedly touching her feet, thighs, arms, and stomach, it was unreasonable for him to assume that she was asleep.  Indeed, she had told him earlier that she was not really a heavy sleeper.  But, even if B.I. were asleep, defendant was so close to her that he could not reasonably think that he would not awaken her by masturbating.  Indeed, she testified that she was awakened because defendant was lying so close to her.  Nor would it have been reasonable for defendant to assume that the darkness would conceal his act as he lay, uncovered, so close to B.I.  Viewing the evidence in the light most favorable to the State, we conclude that the State proved beyond a reasonable doubt that defendant knew that, when he masturbated, B.I. would view him doing so.  Thus, defendant was proved guilty beyond a reasonable doubt of sexual exploitation of a child.

¶ 91                                    III. CONCLUSION

¶ 92    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 93    Affirmed.