NOTICE
Decision filed 08/08/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 250209-U

NO. 5-25-0209

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* LUIS A-B., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Coles County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 24-JD-27 |
| | ) | |
| Luis H. A-B., | ) | Honorable |
| | ) | Jonathan T. Braden, |
| Respondent-Appellant). | ) | Judge, presiding. |

JUSTICE VAUGHAN delivered the judgment of the court.
Presiding Justice McHaney and Justice Boie concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court's adjudication of delinquency for criminal sexual assault is affirmed where sufficient evidence of force was presented.

¶ 2   Respondent, Luis H. A-B., appeals the trial court's finding of delinquency for criminal sexual assault, arguing that the State failed to present sufficient evidence of force for count III. For the following reasons, we affirm the conviction.

¶ 3                               I. BACKGROUND

¶ 4   On June 5, 2024, respondent was charged, by juvenile petition, with two counts of criminal sexual abuse in violation of section 11-1.50(a) and (c) of the Criminal Code of 2012 (Code) (720 ILCS 5/11-1.50(a), (c) (West 2022)) and one count of criminal sexual assault in violation of section

1

11-1.20(a)(3) of the Code (*id.* § 11-1.20(a)(3)). The three incidents involved S.B. and occurred on or around October 18, 2023. On September 18, 2024, the State filed an amended petition with the same three counts and two additional counts. The fourth count alleged criminal sexual abuse in violation of section 11-1.50(c) of the Code (*id.* § 11-1.50(c)) occurring on or about April 21, 2024. The fifth count alleged criminal trespass to a residence in violation of section 19-4(a)(1) of the Code (*id.* § 19-4(a)(1)) on June 3, 2024. Counts IV and V involved S.B. and her residence.

¶ 5     A hearing on the State's petition was held on November 8, 2024. The State withdrew the allegations in count IV and advised the court it would proceed only on counts I, II, III, and V. S.B. testified that she was currently 17 years old. She stated that she and respondent previously had a dating relationship and were the parents of a child born in February of 2024. They began dating in February 2023 after meeting through a friend and dated for approximately 16 months. She found out she was pregnant in June of 2023 and shared the information with respondent, who seemed happy. She stated that respondent brought up the issue of anal sex early in the relationship, and S.B. told respondent that she did not "ever want to do that." She repeatedly told him that she was not interested in having anal sex, but he persisted. Eventually S.B. told respondent she would not do it until she was married. However, respondent did not accept her statement because she had done it in the past with someone she had previously dated.

¶ 6     She stated there was one occasion prior to October 18, 2023, when she had anal sex with respondent. She said they were having vaginal sex at the time, and he accidentally put his penis in her anus. She told him to stop because it hurt. She was bleeding because of it and told him that she did not want that to happen again.

¶ 7     She said respondent's birthday was on October 18, 2023, and they planned to go to a pumpkin patch and go out for dinner with his family. She drove over to his house and hung out.

2

She received permission from her mother to spend the night at respondent's house, but she had to do laundry first. She and respondent left respondent's house and went to S.B.'s house to do laundry. She went to the basement to do laundry, and he went to her bedroom. When she got to the bedroom, respondent was going through papers in her desk and found a book with drawings and got upset. The book included drawings she made when she was dating someone else. He had previously told her to get rid of anything to do with her past relationships. After he found the book, respondent ripped up the book, continued going through the things in her room, ripped up other papers, and knocked things down. She asked what she could do to appease him, and he asked where her stuffed fox was.

¶ 8    S.B. explained that she had a stuffed animal that was a fox. It was the last joint gift she received from her parents before they split up. She was seven years old when they gave her the gift. She stated that the stuffed fox was her only friend through grade school and provided emotional comfort. She stated that respondent knew the importance of the stuffed fox that she named Foxy. When respondent asked her where Foxy was hidden, S.B. was scared because she knew respondent wanted to do something bad to Foxy because he was angry with her. She refused to tell him where it was at first and then pleaded with him not to hurt Foxy. Respondent just kept asking where it was and she eventually retrieved the animal from a bag in the basement because she felt like she did not have any other choice. She returned to her bedroom and shortly thereafter, they left to go back to respondent's house.

¶ 9    S.B. testified that while they were in her car, respondent took Foxy away from her, and when they walked into his house, he went into the kitchen and grabbed a knife off the counter. Respondent told her that she could decide whether he hurt Foxy or his live cat, Luna. She stated that she was somewhat attached to Luna because one of her friends gave it to respondent when

3

they started dating. In response, S.B. told respondent that he could do something to Foxy, so respondent cut off Foxy's ear. He then asked her what body part she wanted him to cut off next. She asked him not to do anything else to Foxy but eventually just said "one of his legs." Respondent was still angry with her during the exchange. She tried to calm respondent down, but nothing worked. He just wanted revenge. He started to cut Foxy's leg off but stopped. She did not know why. Instead, respondent took Foxy to his room, put the animal up in his closet, and said he did not want S.B. to have him anymore.

¶ 10     S.B. then stated that Foxy needed to be washed and took the stuffed animal down to the washer at respondent's mother's house and started a laundry cycle. She returned to the bedroom and tried to talk to respondent. He started getting more upset with her because she was upset about what had just happened. He kept asking her questions and asked how far she would go to protect her stuffed animal. She stayed silent but eventually said, "Anything." Thereafter, respondent threatened to cut off Foxy's head if she did not have anal sex with him. She did not think she had any other choice. She felt that if she did not do what respondent said, "someone would get hurt."

¶ 11     Respondent made her take her clothes off. He then inserted his penis into her anus. She did not want it to happen but felt like she did not have any other option. She did not know if he used any lubricant. She said it hurt. He eventually said he was not going to finish "because he didn't want to be that kind of person." She took it to mean that he did not want to be considered a rapist. After that happened, she went forward with the original plans for his birthday with his family. A couple of days later, she ended the relationship. She was five months pregnant at the time. On October 22, 2023, she and her mother went to the domestic violence shelter in Decatur so she would "feel more safe after the breakup." However, she returned to Charleston, Illinois, two weeks later and resumed the relationship with respondent.

4

¶ 12    S.B. stated that respondent told her nothing like that would ever happen again and that he would be better. They were a little bit better for a while. She delivered the baby in February 2024. She and respondent then had some difficulties after that and eventually she broke up with him again in May 2024. When she told her mother and a family friend what had happened with respondent[1] they encouraged her to go to the hospital and make a report. That was the same night she broke up with him.

¶ 13    After she and respondent split up, respondent continued to communicate with S.B. through text messages. She asked him not to contact her and told him the relationship was over. She worked at Walmart at that time. On June 2, 2024, respondent contacted her and asked if she would go on a date with him. She told him, "Leave me alone." He then asked if he could bring stuff for the baby. She was at work and told him he could leave the stuff outside her car. When she left Walmart, the items were by the car but so was respondent. He then asked her to talk to him and have a conversation. He got into her car. She asked him to get out multiple times and eventually called the police. They told her there was not much they could do except try to convince respondent to leave. Respondent eventually got out of the car. At that point, police told S.B. to get in her car and drive away. She picked up the baby from the sitter and went home. She got there a little after 11 p.m. Respondent then showed up at her house. S.B. confirmed that she did not invite him over. He wanted to talk. She kept telling him to leave, but he refused. He eventually went into the house and into her bedroom. He woke up the baby and then sat down on her bed with the baby. S.B. confirmed that she did not give him permission to enter the house or pick up the baby. She again

---

[1]No additional information to clarify S.B.'s testimony about "what happened" is found in the record.

5

called the police. When the police arrived, respondent put the baby down and went outside to talk to the police. She later obtained an order of protection against him.

¶ 14    S.B. testified that she had been writing in a journal since she was 12 years old. It was how she worked out her feelings and emotions. She wrote down what happened on October 18, 2023, and provided that information to police when she made her report. She identified a copy of the journal entry, and it was entered into evidence with no objection.

¶ 15    The journal contained a more thorough recitation of the October 18, 2023, occurrence. The papers respondent ripped were important certificates of completion and graduation certificates. Respondent also threatened to take letters a friend had written to her. She wrote that respondent made her "nervous." The entry stated that after respondent got Foxy, he asked her if she would do things so he would not hurt the stuffed animal. She agreed to let respondent "cut me down my leg." She said yes to everything because the stuffed animal had always been like a child to her, writing that Foxy "is my entire childhood and the only friend I had ever been able to count on." She sobbed when respondent cut Foxy's ear off. She stated that respondent threatened to kill Luna the cat or Foxy and that was why she felt she had no choice.

¶ 16    The journal entry stated that respondent threatened her with other things she could not remember when she refused to pick the next part to cut off Foxy. He ended up not cutting off Foxy's leg but stated that he would keep the stuffed animal and if he found anything else she was hiding he would cut off another part. After she put the stuffed animal in the washer, respondent "realized that he could get me to do anything by threatening Foxy." He threatened to destroy Foxy if S.B. would not have anal sex. So, she let him have anal sex. Later that day he found a picture of someone on S.B.'s phone and cut off Foxy's other ear and threatened to cut its head off "next time." The journal entry revealed S.B.'s guilt for not protecting Foxy and how she personified

Foxy as a real animal. When she tried to decide which part to allow respondent to cut off the stuffed animal, she chose parts Foxy would not need, *i.e.*, she perceived Foxy as left-handed so she offered up Foxy's right leg to be cut off so the animal would have his dominant arm and could still walk with three limbs and had one ear left to hear. The journal entry ended by stating that she forgot to mention at the beginning that respondent stated that "if you ever cheat on me I will kill the baby."

¶ 17    The text messages between respondent and S.B. spanned from the Friday before the incident to Sunday and were also placed into evidence with no objection. The text messages had respondent repeatedly stating that he could not continue without her.

¶ 18    On cross-examination, S.B. stated that respondent did not physically threaten her in order to get the stuffed animal. She clarified that the first time they had anal sex was an accident. She stated that she thought about leaving when she had the stuffed animal but did not. She stated there were no threats made to prevent her from leaving. When asked if respondent ever physically restrained, coerced, or forced her to have sex, S.B. said, "Once." She further clarified that it was a different incident than the one on October 18, 2023. She agreed that she previously destroyed items related to respondent's ex-girlfriend and that both she and respondent could be jealous. She stated that she did not agree to have sex with respondent after the baby was born. She stated he did not ask her to have sex but asked her to do other things.

¶ 19    On redirect, S.B. clarified that once the six weeks postpartum recovery period elapsed, respondent wanted to have sex all the time. It was painful but respondent coerced her into giving him sex. She was asked why she did not leave and responded, "It would have made things worse." She stated that she believed respondent would "have either physically tried to stop me from leaving or followed me." She stated she was fearful of respondent because of his anger. On recross, she said it was correct that she was fearful of respondent, but he did not physically force himself on

7

her. Following S.B.'s testimony, a text written in Spanish by respondent to S.B. was read by respondent's interpreter that revealed respondent felt guilty over his actions about sex, which he called a "sex addiction" or "fetish." He repeatedly asked her to get back together with him in the text and admitted that S.B. "didn't deserve what I did."

¶ 20    Detective Aaron Gullion, of the Charleston Police Department, testified that he was assigned to S.B.'s case. He reviewed the initial report and was contacted later due to discrepancies about how they should proceed. S.B. was eventually scheduled for an interview at the Child Advocacy Center due to her age. Detective Gullion unsuccessfully tried to speak with respondent. The officer received an email from S.B. containing communications between respondent and S.B. He also reviewed the long text in Spanish and noted that respondent "made several comments about feeling guilty about what he had done." This included "having regrets about coercing [S.B.] into sexual intercourse directly after their child was born" and the incident at respondent's house where he threatened to damage S.B.'s property and requested she have anal sex with him when she did not want to do so.

¶ 21    On cross-examination, Detective Gullion agreed that respondent did not apologize for either anal or vaginal intercourse. He also agreed that respondent expressed regret for threatening Foxy in order to have anal sex. Following Detective Gullion's testimony, the State rested.

¶ 22    Defense counsel called respondent to testify. Respondent admitted using the threat of harm against Foxy to have anal sex with S.B., stating:

> "I threatened her with that, but nothing ever happened because I was pretty upset and when I saw her crying, I stopped and I told her, 'I'm not going to do anything,' but before that, I felt like if it was like the other relationships that she had *** that she will say that they have done something without her permission or to hurt her."

8

¶ 23    He disputed having "anal or normal sex" with S.B. on his birthday, except earlier that day at S.B.'s mother's house. He explained that he was mad about the retained items from S.B.'s previous relationships because S.B. made him delete everything from his prior relationships. He admitted cutting off Foxy's ear and threatening to cut other parts off the stuffed animal. S.B. told him it was about control, and he said, "If that's what you think, then—then we can have anal sex. Otherwise, I'm going to cut Foxy." He testified that he was trying to see his child on June 3, 2024. He stated that he was unable to see his child because S.B.'s mother would threaten or mistreat S.B. if respondent was at S.B.'s house. He had not seen his child since his arrest. He wanted to spend time with his child and S.B. He stated that S.B. always gave consent either before or after they had sex. She would say it was "fine" or act "like she wanted to." He stated that his apologetic text was because he hurt S.B.'s feelings with his actions.

¶ 24    On cross-examination, respondent agreed that he asked S.B. for anal sex when they were dating. He stated that she told him she was not ready and therefore, he waited. He disputed having anal sex with S.B. on his birthday but admitted cutting off both of Foxy's ears on his birthday.

¶ 25    Elizabeth Bayardo-Ramirez[2] testified that she went to bed around 11 p.m. on the night of respondent's birthday. She stated that she did not hear anything unusual that night, although in the past she had spoken to respondent and S.B. about respecting other people who lived in the house. She said that S.B. came to the house early with gifts for respondent. Elizabeth worked the next day and woke up at 4:30 a.m. She did not know if S.B. spent the night although she knew that S.B.'s mother gave S.B. permission to spend the night with respondent. Following Elizabeth's testimony, the defense rested. The State provided no rebuttal evidence.

---

[2]Although the record does not clarify, it appears that Elizabeth is respondent's mother or close relative.

¶ 26    The parties provided closing argument. The State argued that it met its burden of proof because respondent placed his penis in S.B.'s anus by a threat of force and also by the use of force by cutting her most prized possession. Defense counsel stated that respondent's text message "expressed regret and contrition over various acts of emotionally manipulative behavior" that could be characterized as "emotional abuse." Defense counsel further argued that respondent disputed having anal sex with S.B. on his birthday and the State failed to meet its burden of proof. Following argument, the court took the matter under advisement.

¶ 27    On November 15, 2024, the trial court rendered its verdict. The court found S.B. credible and stated her testimony indicated that the parties engaged in nonconsensual anal sex. The court found that respondent "coerced and forced [S.B.] into that conduct," noting the "significant sentimental value" of Foxy to S.B., respondent's awareness of the sentimental value, and respondent's threat of destruction to coerce S.B. into nonconsensual anal sex. The court noted S.B.'s previous rejection of such sexual activity and found respondent's text message "corroborated this and demonstrated that [respondent] had a consciousness of guilt for the actions that he took." Thereafter, the court found the State proved counts I, II, and III. After discussing the evidence related to trespass, the court also found the State proved count V. The trial court ordered a social history investigation and sex offender evaluation.

¶ 28    The social history investigation was filed on January 3, 2025. The investigation revealed a history of self-harm, anxiety, depression, a prior history of cutting and hitting himself along with prior suicidal thoughts and a suicide attempt while admitted to Streamwood Behavioral Healthcare from July 11 to July 18, 2024. His school history revealed that respondent dropped out while in the eleventh grade and had one suspension due to "sending threatening comments towards another student via text message." At that time, respondent stated he would "go get him" and did not care

about any repercussions. Respondent had no work history due to his immigration status. An addendum to the social investigation report, consisting of respondent's sex offender evaluation and risk assessment, was filed on February 24, 2025.

¶ 29    On February 28, 2025, the parties advised the court of a joint recommendation for sentencing. S.B. read a victim impact statement. The court accepted the joint recommendation, and respondent was placed on 24 months' probation, 30 days of detention with a mittimus stayed, and 20 hours of public service employment. He was also required to undergo mental health and substance abuse evaluations and comply with all recommendations, take medications as prescribed, comply with Sex Offender Registration Act and sex offender therapy, have no contact with S.B., have no contact with any person under the age of 18, not possess pornography, not use alcohol or cannabis, gain employment, and violate no laws. Respondent timely appealed.

¶ 30                                              II. ANALYSIS

¶ 31    On appeal, respondent raises only one issue. He contends the State failed to prove him guilty beyond a reasonable doubt of committing criminal sexual assault. In support, he relies on the statutory definition of "force or threat of force" (see 720 ILCS 5/11-0.1 (West 2022)) and argues that there was no evidence of a threat of force or violence against "the victim or any other person." The State disagrees.

¶ 32    The reasonable doubt standard is applicable to juvenile delinquency petitions. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 47. Sufficiency of evidence claims involve reviewing the evidence in the light most favorable to the State, and we will only reverse the decision if we find that no rational finder of fact could have found the State proved the offenses beyond a reasonable doubt. *In re W.C.*, 167 Ill. 2d 307, 336 (1995). It is the duty of the factfinder, not a court of review,

11

to assess the credibility of the witnesses, resolve conflicts in evidence, and decide what reasonable inferences to draw from that evidence. See *People v. Milka*, 211 Ill. 2d 150, 178 (2004).

¶ 33    The elements of criminal sexual assault, relevant in this case, are found in section 11-1.20(a)(1) of the Code. 720 ILCS 5/11-1.20(a)(1) (West 2022). That section provides that a "person commits criminal sexual assault if that person commits an act of sexual penetration and: (1) uses force or threat of force[.]" *Id.* Respondent no longer argues that the State failed to prove penetration. His sole argument is whether the State proved the use of "force or threat of force."

¶ 34    The statutory definition of "force or threat of force"

"means the use of force or violence or the threat of force or violence, including, but not limited to, the following situations:

(1) when the accused threatens to use force or violence on the victim or on any other person, and the victim under the circumstances reasonably believes that the accused has the ability to execute that threat; or

(2) when the accused overcomes the victim by use of superior strength or size, physical restraint, or physical confinement." *Id.* § 11-0.1.

Respondent's argument contends that because he only threatened damage to S.B.'s stuffed animal, the State failed to meet its burden. We disagree. The statutory definition explicitly states that "force or threat of force" is "*not* limited to" the situations listed. (Emphasis added.) *Id.*

¶ 35    Additionally, respondent's argument fails to consider all the evidence. S.B.'s journal entry revealed a threat to kill her child if she ever cheated. Further, the underlying argument arose from S.B.'s retention of items from a former relationship, and respondent's threats to destroy the stuffed animal were a punishment for S.B.'s failure to obey his prior directive to destroy all items from her past relationships. More importantly, respondent's fixation on the stuffed animal was based on

12

his knowledge of its importance to S.B. Her journal entry stated, "A couple times he offered up a couple of different options[,] but he didn't stick with them because they were just to test me." Notably, S.B. agreed to every option including allowing respondent to cut her leg.

¶ 36    "The element of force refers to actions of the defendant that physically compel the victim to submit to the act of sexual penetration." *People v. Mpulamasaka*, 2016 IL App (2d) 130703, ¶ 74. While the statute attempts to define force or threat of force, it uses the word "force" in the definition without further clarification. See 720 ILCS 5/11-0.1 (West 2022). Regardless, force has been previously defined as " '[p]ower, violence, compulsion, or constraint exerted upon or against a person or thing.' " *People v. Isunza*, 396 Ill. App. 3d 127, 131 (2009) (quoting Black's Law Dictionary 644 (6th ed. 1990)).[3] The word "coerce" is defined as "to compel by force or threat." Black's Law Dictionary (12th ed. 2024). "The word "compel" is defined as "to cause or bring about by force, threats, or overwhelming pressure." *Id.*

¶ 37    Here, S.B.'s testimony, which the trial court found credible, revealed the physical threat of respondent cutting S.B. down her leg or performing anal sex instead of destroying her emotional support stuffed animal. It is readily apparent that respondent's actions were based on what would traumatize S.B. the most as evidenced by her willingness to be cut or have anal sex over having the last gift from her parents—that was personified as an emotional support item—desecrated. Under these facts, there is no question that S.B. was coerced and compelled into having anal sex with respondent—despite being five months pregnant and abhorring anal sex—to protect Foxy from desecration.

---

[3]Black's Law Dictionary is routinely used by Illinois courts to aid in statutory interpretation. See *People v. Ward*, 215 Ill. 2d 317, 325 (2005); *People v. Blair*, 215 Ill. 2d 427, 439-45 (2005).

¶ 38　It is easily inferable that it was only respondent's threats to destroy a sacred object that coerced S.B. to perform anal sex, an act unquestionably that went against her will, especially when considered in junction with respondent's threat to kill S.B.'s unborn child if she ever cheated. As stated by S.B., if she "didn't do what he said, *someone* would get hurt."

¶ 39　Upon our review of the evidence and taking the reasonable inferences stemming from that evidence in favor of the prosecution (see *People v. Jones*, 2023 IL 127810, ¶ 32), we cannot find the evidence was "so unreasonable, improbable, or unsatisfactory" (*People v. Smith*, 185 Ill. 2d 532, 542 (1999)) to justify reasonable doubt as to respondent's conviction for criminal sexual assault. Accordingly, we find the evidence sufficient to establish that respondent used force against S.B. in a manner consistent with the statute and affirm the trial court's finding of delinquency as to count III.

¶ 40　　　　　　　　　　　　　　　III. CONCLUSION

¶ 41　For the above-stated reasons, we affirm the trial court's findings of delinquency.

¶ 42　Affirmed.